645 A.2d 1381

Don HERZOG and Tri–State Land Development
Corporation, Petitioners,

v.

DEPARTMENT OF ENVIRONMENTAL
RESOURCES, Respondent,

Charles W. SHAY and Judith C. Shay, Petitioners,

v.

DEPARTMENT OF ENVIRONMENTAL
RESOURCES, Respondent.

Commonwealth Court of Pennsylvania.

Argued May 12, 1994.

Decided July 19, 1994.

Reargument Denied Sept. 8, 1994.

116

118

Mary Ann Rossi for petitioners Herzog and Tri–State Development Corp.

Richard B. Ashenfelter, Jr., for petitioners Shay.

Margaret O. Murphy, Asst. Counsel, for respondent.

Before CRAIG, President Judge, and SMITH, J., LORD, Senior Judge.

LORD, Senior Judge.

Charles and Judith Shay and Don Herzog and Tri–State Development Corporation (Tri–State) appeal an Environmental Hearing Board (EHB) decision of June 16, 1993 which reads as follows:

AND NOW, this 16th day of June, 1993, it is ordered that the appeal is dismissed except with respect to Don Herzog's

liability under § 316 of the CSL. The appeal is sustained to that extent.

This order was issued after a two-day hearing and post-trial briefs.[1] The dismissed appeal was from a compliance order of the Department of Environmental Resources (DER) issued September 26, 1989. The appeal to the EHB from DER's compliance order was filed in the names of Charles and Judith Shay, and in the name of Don Herzog d/b/a Tri–State Land Corporation.

### The Violations

The Department's compliance order charged the Shays and Herzog with violation of Section 601 and 610 of the Solid Waste Management Act (SWMA), Act of July 7, 1980, P.L. 380, *as amended,* 35 P.S. §§ 6018.601, 6018.610, and the regulations promulgated thereunder, as well as with violations of Sections 503, 601, and 611 of the Clean Streams Law (CSL), Act of June 22, 1937, P.L.1987, *as amended,* 35 P.S. §§ 691.503, 691.601, 691.611, and the regulations promulgated pursuant to that statute. Under these acts and their implementing regulations, DER cited the Shays and Herzog for improperly transporting and disposing solid waste, operating a construction/demolition waste landfill without a permit, producing offensive malodors, violating a previous DER order to cease waste dumping, refusing entry onto the property, and creating a public nuisance.[2] DER's compliance order required the Shays and Herzog to remove all materials except clean fill from the property to a permitted disposal site, to conduct soil sampling and to provide documentation of these measures within fifteen days.

1. Both the Shays and Herzog encountered difficulties in hiring and keeping counsel. The details are unnecessary to this opinion. They appeared *pro se* at the hearings.

2. Section 503 of the CSL provides that a violation of orders and regulations adopted by DER under the statute constitutes a nuisance. Section 601 of the SWMA contains a similar provision and imposes liability for abatement on the person or municipality "committing such a violation."

*Background*

On consideration of the evidence on appeal from this order, the EHB found the following facts:

5. The Shays are joint owners of a tract of land in Westfall Township, Pike County, which they acquired in 1984. This tract of land is wedged between the Delaware River and Interstate 84 at the point where the eastbound lanes of this highway swing toward the southeast to cross the Delaware River bridge. A road paralleling Interstate 84 and known as Shay Lane provides access to the tract. Rose Lane, which abuts the tract on the southwest, has residences along one side. The Borough of Matamoras lies to the north on the opposite side of Interstate 84 (N.T. 339; Exhibit C–6).

6. The Shays have devoted the northeasternmost portion of the tract to use as a campground and docking area. The remainder of the tract is the portion involved here (Site) (Exhibits C–6 and C–7).

7. During the construction of Interstate 84 in the mid–1960's, the Pennsylvania Department of Transportation (Penn DOT) used the Site as a borrow area. Soil was excavated and used as fill for the highway. Then tree stumps and similar debris were dumped into the hole and covered with topsoil. These operations left a bowl-shaped area subject to frequent flooding by the Delaware River (N.T. 339–343; Exhibit C–6).

8. In 1988 the Shays began construction of a 750–seat restaurant adjacent to the Site and wanted to fill in the Site to create a 200–car parking area. Steven S. Burd, District Manager of the Pike County Conservation District, advised Charles W. Shay on October 7, 1988 that he did not think 'that the work which you are proposing requires any permits from [DER]' (N.T. 280–282, 343; Exhibits S–1).

9. The Shays arranged with Kelly Wall to bring clean fill to the Site. Instead, Wall hauled in shredded demolition waste, roofing material, construction debris, miscellaneous wood, paper and metal products, foam rubber, automobile

tires, recording tape, office waste, newspaper and baled waste (N.T. 343–345; Exhibit C–10).

10. Responding to complaints of unlawful dumping, DER officials inspected the Site on October 19 and December 5, 1988, found the material described in Finding of Fact No. 9 and issued a Notice of Violation to the Shays on December 6, 1988 (N.T. 232, 344; Exhibit C–10).

11. After an inspection on February 27, 1989 revealed that the material was still in place on the Site, DER issued an Order and Assessment of Civil Penalties on March 6, 1989. The Order cited the Shays for the unlawful disposal of solid waste, directed them to remove the material and assessed them a civil penalty of $20,000 (N.T. 345; Exhibit C–10).

12. The Shays took no appeals from the December 6, 1988 Notice of Violation or the March 6, 1989 Order and Assessment of Civil Penalties (N.T. 233–234).

13. The Shays, by their counsel, Randolph T. Borden, requested a meeting with DER to discuss the March 6, 1989 Order and Assessment of Civil Penalties.

14. The persons at the meeting discussed ways of removing the material dumped on the Site by Kelly Wall in light of the Shays' financial condition. Don Herzog proposed a plan whereby processed construction and demolition waste from transfer stations holding permits from the New York Department of Environmental Conservation would be brought to the Site, converted into unregulated clean fill principally by the removal of all but a de minimis amount of wood and other large items, and used in place of the material dumped by Kelly Wall. This latter material would be dug up and hauled away to an appropriate disposal facility (N.T. 130–131, 245–246, 254–256).

15. As part of the plan proposed at the March 23, 1989 meeting, Don Herzog presented DER with a list of acceptable accounts, a list of acceptable trucking companies, and a list of safeguards. The list of safeguards contained the following items:

1. 2 Tri–State employees in N.Y. monitoring transfer stations.

2. 2 Security Guards on Duty from 6:00 p.m.–6:00 a.m. 7 days a week.

3. 1 Load Checker on viewing stand to superficially inspect each load.

4. 5 Pickers to pick the wood out of each load and any paper.

5. 1 Floor Foreman to manage pickers and check loads spread by machines.

6. 2 Tri–State employees on site at all times.

7. 2 Tractors with York Rakes to pull out any small pieces of wood.

8. 1 Chipper to chip wood and load into dump truck.

9. Wood removed from site on a daily basis.

16. On April 18, 1989 DER strongly advised the Shays to cease bringing in any new fill from New York transfer stations (a) until DER could investigate the potential for harm to the primary well serving the Borough of Matamoras, (b) until DER officials could visit the New York transfer stations, and (c) until reports were received concerning contaminants in the new fill (N.T. 300–301; Exhibit C–13).

17. Sometime after April 18, 1989, representatives of DER, accompanied by Herzog, Charles W. Shay and representatives of the New York Department of Environmental Conservation, visited several New York transfer stations, and observed the processed construction and demolition waste. DER agreed that, with additional removal of wood, (down to no more than 10%), the processed material would be suitable as fill for the Site (N.T. 136–138, 269–273, 305).

18. When DER officials visited the Site while dumping operations were being conducted, they observed

(a) a stand high enough to permit an inspector to examine the contents of incoming trucks;

(b) men and equipment picking unacceptable materials out of the new fill;

(c) containers for the deposit of unacceptable materials;

(d) a wood chipper;

(e) the rejection of some truckloads containing large quantities of wood;

(f) the typical quantity of wood to be 10% or less

(N.T. 102, 119–123, 140–141).

19. Construction and demolition waste can contain lumber, metal, asphalt, brick, block, wallboard, corrugated container board, electrical fixtures, carpeting, furniture, appliances, nails, paint chips, etc. Screening was expected to remove all but the smallest of these items. Work at the Site was expected to remove additional amounts (N.T. 121, 125–127, 137–139, 267–269).

20. DER officials visited the Site on May 30, 1989, dug a hole in the new fill 18 to 20 inches deep, and discovered large pieces of wood, metals and cloth fragments. A meeting was held the following day between DER officials, Don Herzog and Charles W. Shay, at which the unacceptable materials at the Site were discussed. A letter, setting forth the results of this meeting, was sent to the parties by DER on June 7, 1989. Basically, it mandated the complete removal of the old fill by June 21, 1989, the gridding and sampling of the new fill already in place, the sampling of new fill brought to the Site in the future, and the submission by Charles W. Shay of an application for Beneficial Use of Processed Demolition Waste by June 21, 1989 (N.T. 101–102, 142–145, 149, 242–243, 275, 291–292; Exhibit H–7).

21. An application for Beneficial Use of Processed Demolition Waste was filed by Charles W. Shay on or about June 21, 1989 (N.T. 275).

22. As a result of malodor complaints received from residents of Rose Lane, a DER official inspected the Site on July 8, 1989. Adjacent to several residences, the official detected an odor that he described as 'ammonia-like or wet drywall-like.' On July 10, 1989 DER issued Compliance Order 2890030 to the Shays, citing them for producing the malodors and directing them to cease operations for a

period of ten days. The Shays took no appeal from this Compliance Order (N.T. 98–100, 128, 234–235; Exhibit C–5).

23. Soil samples of the new fill taken by Northeastern Environmental Associates, Inc. and DER in July 1989 reflected high levels of lead (Notice of Appeal; N.T. 100–101, 235; Exhibit C–14).

24. Because of the lead contamination, DER informed Appellants on September 15, 1989 that the only activity that would be allowed on the Site would be the removal of the lead-contaminated fill to an approved disposal facility. No more new fill was to be brought to the Site (N.T. 236–237; Exhibit C–8).

25. DER again warned Appellants on September 20, 1989 that no more new fill was to be brought to the Site and that the only allowable activity was removal of the lead-contaminated fill to an approved disposal facility. This warning was sent because of reports that Appellants were about to resume operations (N.T. 237–238; Exhibit C–9).

26. Attempting to investigate a rumor that Appellants had resumed operations, DER personnel were denied entry to the Site on September 25, 1989 (N.T. 97–98).

27. On September 26, 1989 DER issued the order forming the basis of this appeal (N.T. 92, 113; Exhibit H–4).

## Scope of Review

It is important to keep in mind that our scope of review in this case is limited. An excellent summary of our scope of review is found in *Pennsylvania Game Commission v. Department of Environmental Resources*, 97 Pa.Commonwealth Ct. 78, 81–82, 509 A.2d 877, 880 (1986).

We begin by noting that our scope of review of Board decisions is limited by 2 Pa.C.S. § 704 to determining whether the Board committed constitutional violations, errors of law, or whether any necessary findings of fact made by the Board were unsupported by substantial evidence. *Willowbrook v. Department of Environmental Resources*, 92 Pa.Commonwealth Ct. 163, 165, 499 A.2d 2, 3 (1985).

When we review an administrative order, the prevailing party is entitled to the benefit of every inference which can be logically drawn from the evidence when viewed in a light most favorable to the prevailing party. *Doerr v. Pennsylvania Liquor Control Board*, 88 Pa.Commonwealth Ct. 610, 614, 491 A.2d 299, 302 (1985). Questions of resolving conflicts in the evidence, witness credibility, and evidentiary weight are properly within the exclusive discretion of the factfinding agency, and are not usually matters for a reviewing court. *Chapman v. Pennsylvania Board of Probation and Parole*, 86 Pa.Commonwealth Ct. 49, 484 A.2d 413 (1984). An administrative agency has wide discretion when establishing rules, regulations, and standards, and also in the performance of its administrative duties and functions, and this Court cannot overturn an agency's exercise of its discretion absent proof of fraud, bad faith, or blatant abuse of discretion. *Wengrzyn v. Cohen*, 92 Pa.Commonwealth Ct. 154, 158, 498 A.2d 61, 62 (1985).

### Analysis Of Appellants' Argument

These appeals raise several questions and arguments that are common to both the Shays and Herzog. They also raise individual arguments on behalf of Judith Shay and on behalf of Don Herzog. This opinion will adhere to that same division, discussing first the citations for violations of the SWMA and then the citations for violations of the CSL.

### Liability of the Shays and Herzog for SWMA Violations

The first and principal argument on behalf of the Shays and Herzog is that, since DER representatives visited the New York transfer stations and approved bringing the New York material to the site, and, since DER representatives, who were on the site for a period of time, did not object when the material was brought in, DER acquiesced in the Shay's and Herzog's actions. DER is thus estopped from "converting fill which it once approved into unapproved fill" and finding a violation of the SWMA. Both the Shays and

Herzog raised this same issue before the EHB. The EHB disposed of the contention as follows:

> The problem with this argument is its lack of factual support. We have found that Herzog proposed a plan whereby "processed construction and demolition waste" would be brought to the Site, "converted into unregulated clean fill" by the removal of large items and all but "a de minimis amount of wood" and used in place of the material deposited by Kelly Wall (Finding of Fact No. 14). The list of safeguards (Exhibit H–3) that Herzog gave to DER at their first meeting (Finding of Fact No. 15) is conclusive evidence that, from the beginning, DER was led to believe that the fill material would not be typical construction/demolition waste. Why else would Herzog promise to monitor the New York transfer stations, have an elevated stand at the Site for inspecting incoming loads, have pickers to remove wood and paper from the material, have tractors with rake attachments to pull out small pieces of wood, and have a chipper to reduce the wood to mulch? None of these safeguards was relevant if the approved material was construction/demolition waste.
>
> We have found, in addition, that DER warned the Shays to pre-test the fill material for possible contaminants (Finding of Fact No. 16) and approved the 'processed' construction/demolition waste observed in New York with the understanding that additional wood would be removed on Site so that the content would be no more than 10% (Finding of Fact No. 17).
>
> When an inspection in late May 1989 disclosed large pieces of wood, metals and cloth fragments, DER convened a meeting of the parties followed up by a letter (Exhibit H–7) again detailing what was acceptable (Finding of Fact No. 20). That letter firmly establishes that the agreement was 'clean fill with a de minimis wood content' and that the materials discovered in late May did not satisfy that description. The letter sets forth the actions to be taken to prevent a recurrence of the problem and then states: "The purpose of the above agreement is to bring Mr. Shay in line

with the original agreement regarding rigorous monitoring and separating procedures for a de minimis wood content."

DER witnesses acknowledged that, because the fill material started out as construction/demolition waste, they anticipated that it would contain a certain amount of metal, nails, asphalt, wallboard, wire, carpeting, etc. They expected the screening and on-site activities to remove all but the smallest of these items. By allowing such items to remain, DER undoubtedly was stretching the definition of clean fill. Judging from the testimony of all the parties, we attribute this to a DER desire to find an economically viable solution to the problem facing the Shays—the removal of the Kelly Wall material when financial resources allegedly were inadequate.

(Decision of the EHB, June 16, 1993, pp. 23–24).

When we review the validity of the EHB's conclusion on this issue, we must bear in mind again our scope of review and turn to the record to ascertain whether there is substantial evidence to support the EHB's decision. A review of the record reveals the following scenario with respect to the agreement regarding the New York fill.

On March 9, 1989, Mr. Keiser for DER wrote to Mr. Borden, who represented the Shays. This letter suggested a meeting on March 20, 1989. It suggested three issues to be resolved in the meeting, the foremost concern being the nature of the fill. It suggested Mr. Shay have his own testing of the proposed fill before bringing the fill on site and stated that "this testing should be done not only for wood content but also for the presence of contaminants."

The meeting was held and Mr. William McDonnell, DER's regional solid waste program manager, provided the following testimony regarding the conclusions of the meeting:

Q. Now, as a result of those meetings that you say started in March of 1989, what were the directions or the recommendations or advice the Department gave to Mr. Herzog and Mr. Shay and Mr. Ryder and Mr. Borden?

A. At the March meeting, Mr. Herzog was brought to the meeting by Mr. Shay and Attorney Borden as a possible source of material for construction of Mr. Shay's parking lot.

Mr. Shay and Mr. Borden has [sic] been to several meetings in which it appeared that they recognized that the permitting of the site for a construction and demolition waste landfill was precluded. And their request was essentially their ability to convert processed construction and demolition waste from New York transfer stations into an unregulated material, which is essentially the clean fill.

The description was given that the material must be uncontaminated, and this had been a source of concern going back to September of 1988 and explaining to Mr. Shay and Mr. Borden why the Department's concern was so great.

The main aspect of the conversion process was the uncontaminated nature, which the material must represent and can only be represented by chemical analysis, and the logistical difficulty in doing that and to do it suitably.

Q. Now, what did you anticipate would be the fill that was coming in? How would you describe it?

A. It was agreed to by the Shay party that the material what [sic] would be brought to the site would be processed C/D waste from transfer stations permitted by the New York Department of Environmental Conservation, DEC, and which would have approximately the lowest level of wood content which could be produced in the processed waste from most transfer stations, and that level would be about ten percent, and that that level of ten percent could then be retrieved on the site before the material was in place into the fill area, in addition to being with suitable demonstration that it was uncontaminated.

Q. Did we ever receive any suitable demonstration that it was uncontaminated ahead of time or did the Department ever receive that?

A. No.

Q. Were they advised to sample ahead of time?

A. Yes.

(N.T., July 22, 1992, pp. 245–247).

At the meeting where the acceptability of the New York fill was discussed, Herzog promised safeguards to ensure the quality of the fill. These safeguards included Tri–State employees' monitoring of the fill leaving the New York transfer stations; a load checker on a viewing stand; pickers to remove large pieces of wood; employees on site at all times monitoring the dumping; and various equipment to rake and chip wood (finding of fact No. 15). As to the evidence of the violation of this agreement, we turn to DER's letter of June 7, 1989 to the then counsel to the Shays, which reads in relevant part:

On May 30, 1989, John J. Leskosky, Scott Detwiler and I visited the site. We found that Mr. Shay was permitting, as New Fill, Construction/Demolition waste, specifically metals, cloth fragments and large pieces of wood as well as soils, brick and stone, to be dumped on the site. The above items were being compacted on the site as part of the base in the newly filled area. The site is presently about half filled with the New Fill. Also, approximately 1500 yards of the Old Fill is yet to be removed from the Old Fill area. After our visit to New York, it had been agreed between the parties that only screened C/D waste, supplemented by brick, concrete and stone for compacting purposes, was to be brought on-site. That procedures was not followed by Mr. Shay. Instead, other features of C/D waste, as noted above, are now on-site. Clearly, what is presently on-site as New Fill is not clean fill with a *de minimis* wood content. Therefore, in order to resolve this new problem, several agreements were reached at our meeting as noted below:

(Exhibit, H–7, N.T., July 22, 1992).

Finally, evidence was produced which is devastating to the Shays' and Herzog's argument on this issue. On September 15, 1989, DER wrote to their attorney that no more new material (the fill from New York) may be added to the site.

DER again made this admonition on September 20, 1989 and, when DER heard rumors that the fill had been resumed, inspectors were sent to the site. They were denied access. The September 26, 1989 order was then issued. Despite this order, the fill operations continued. In utter disdain for DER, the Shays and Herzog continued to operate and, on September 28, 1989, they were videotaped in these activities. We have viewed these tapes and they obviously demonstrate that the Shays and Herzog were not only dumping after the order to cease, but they were filling the site with large pieces of wood and other construction/demolition waste materials. The videotapes show that the fill did not conform in any degree to the description of the type of fill which had been agreed upon. We therefore reject the argument that DER acquiesced in the Shays' and Herzog's actions.

We are also unpersuaded by their related argument that DER failed in its burden to prove that the Shays and Herzog were operating a construction/demolition waste landfill without a permit in violation of the SWMA and its implementing regulations.

The argument goes that, by its initial agreement and subsequent acquiescence to their activities, DER allowed the Shays and Herzog to bring in material that was less than clean fill, and so DER cannot now cite them for operating an unpermitted construction/demolition waste landfill.

"Construction/Demolition Waste" is defined at 25 Pa.Code § 271.1 to include waste wood, plaster, metals, bricks, concrete and other materials and dredging waste resulting from the construction or demolition of structures. Expressly excluded from this definition of construction/demolition waste are uncontaminated soil, rock, gravel, unused brick, block and concrete *when these materials are used as clean fill.*

However, as Herzog notes in his brief, McDonnell testified, on cross-examination and well as on direct, that, under their agreement with DER, the Shays and Herzog were permitted to take processed waste from the New York sites and *"convert it into clean fill,"* or *"something close to* the Pennsylvania law

regarding *clean fill* with a certain amount of wood in it." (N.T. July 22, 1992, p. 267). "Clean fill" is defined at 27 Pa.Code § 271.1 as:

> [u]ncontaminated, non-water soluble, non-decomposable inert solid material used to level an area or bring an area to grade

McDonnell also testified that this definition does not allow for the presence of wood but agreed that DER was "giving [the Shays and Herzog] a little leverage in allowing [them] to bring in a certain percentage of wood along with the [fill material] from New York . . . to clean that up and try to bring it into conformance . . . [t]o meet the requirements of clean fill." (N.T., July 22, 1992, pp. 267–268).

It is clear from this and other testimony, as well as from the documentary evidence to which we have previously referred, that the parties understood that the Shays and Herzog were allowed to bring in the waste material from New York provided it had no contaminants, and provided further that the fill, when converted, coincided as nearly as possible with the regulatory definition of clean fill with a *de minimis* amount of wood. As we have noted, the Shays admitted that this fill is contaminated with lead. Nonetheless, DER's characterization of the fill material as construction/demolition waste does not turn on the presence of contaminants alone. In addition to the contamination, the exhibit tapes reveal that the fill contained building materials *other than* those which, by virtue of their exclusion from the definition of construction/demolition waste, are considered clean fill. That is, there are decomposable materials other than soil, rock, stone gravel, unused brick, block and concrete. In the borings depicted on the tapes, there are metal fragments, some large; cloth fragments; used building materials; plaster and large wood pieces. All of these latter substances are *included* in the regulatory definition of construction/demolition waste. Thus, there is ample evidence to show that the activities in which the Shays and Herzog engaged conform to the regulatory definition of construction/demolition waste landfill operations. DER's agreement to allow a fractional wood content in the fill does not

alter the statutory definition of construction/demolition waste, the landfilling of which requires a permit.

## Remedy

■ The Shays and Herzog challenge as unreasonable the remedy contained in DER's compliance order that directs them to remove all material not clean fill from the site. They suggest instead that some form of on-site remediation is appropriate. The Shays and Herzog did not raise this issue in their notice of appeal to the EHB; they *did* raise it in their pre-hearing memoranda. The EHB stated that the issue was raised therein only as part of the appellants' position that DER approved the placement of the offending material, which argument we have already concluded the EHB correctly rejected. The Shays and Herzog argue, however, that their mention of remediation in their pre-hearing memoranda was broader. They point to excerpts discussing ongoing discovery and a forthcoming Center for Hazardous Materials Research (CHMR) study for on-site excavation and remediation. This study was apparently being prepared in compliance with a Pike County Court of Common Pleas injunctive order obtained by DER against the Shays.

■ Even assuming, *arguendo*, that the remediation issue was properly raised before the EHB and therefore was not waived, there is insufficient evidence at best to support the Shays' and Herzog's contention that on-site remediation, rather than removal, is appropriate. They contend the EHB is responsible for errantly excluding much of their evidence by not admitting the CHMR remediation alternatives report mentioned above and by striking part of the testimony of David Glaser, a CHMR technical representative who was involved in preparing the report. However, we conclude the EHB properly excluded the report. It was available to the Shays and Herzog in January 1992, yet was not presented to DER until July 20, 1992, the day before Glaser testified. (N.T., July 21, 1992, pp. 309–314). DER objected to the report and the EHB excluded it as prejudicial. (N.T., July 21, 1992, pp. 309–314, 333). Clearly, the Shays and Herzog were

not abiding by their own pre-hearing memoranda statements that additional witnesses and evidence from ongoing discovery would be presented when available. We agree that the prior availability of the report and its late presentation rendered it properly excludable by the EHB and agree that DER would have been severely prejudiced otherwise.

Logically, the EHB could have also declined to hear any of Glaser's testimony, on the grounds that he was a late-presented witness. However, the EHB allowed Glaser to testify on nonremedial subjects only, and, despite the fact that Glaser had no participation in the January *1991* CHMR waste characterization sampling and analysis plan (SAP), introduced by DER for tests results therein, the EHB allowed him to testify on some of that report's tests.

In its decision, the EHB did strike approximately two transcript pages of Glaser's testimony, apparently viewing that testimony as linked to the excluded January 1992 report on remedial alternatives. While the Shays and Herzog make much of this action, the stricken testimony itself is clearly insufficient to support their substantive argument. For example, Dr. Glaser testified that the "best" remedy is "a very subjective term" which means "different things for different people"; his position and experience is that "a site" can be remediated in place and "should probably be done that way"; and he recommended the site here be brought back "to its original contour" and natural grade, which is "a viable option." (N.T., July 21, 1992, pp. 329–331). Even assuming, again, that all of Dr. Glaser's testimony could not be stricken, or that this particular portion should not have been stricken, the Shays and Herzog have not shown that DER, which understandably has the power to order the removal of material dumped in violation of the law,[3] should have instead allowed the material to remain and be remedied in some other manner.

■ The Appellants also argue that the EHB erred in denying their application for reconsideration, filed in order to

3. *See* 35 P.S. § 6018.604; 35 P.S. § 691.601; Section 1917–A of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, *as amended,* 71 P.S. § 510–17.

re-open the record for introduction of the "Ebasco Report," which was purported to be after-discovered evidence of the arbitrariness of DER's remedy. DER contends that the Shays and Herzog mischaracterize the substantive import of this report. In any event, DER is correct that the report is not in the record before us. Nor is the EHB's denial of reconsideration before us; the appellants never appealed that decision. Their argument as to the report has the practical effect of asking this Court to vacate and remand an unappealed decision not before us based on a report not in the record. This we will not do.

Even if we extend to the appellants for the moment the benefit of any doubt as to waiver of the remedy issue and the stricken testimony, we conclude that their remediation arguments do not merit a remand of this case and do not constitute reversible error on the part of the EHB, whose decision pertaining to the remedy we will affirm.

### Individual Liability of Herzog

 Herzog contends that DER failed to present sufficient evidence to establish his individual liability. He maintains that he acted in a representative capacity for Tri–State at all times and that he made that fact clear to DER at all times.

DER counters that the record establishes Herzog's individual liability under a "participation" theory. It argues that liability thus attaches to Herzog in his own right because of the wrongful activities in which he himself engaged at the site. We agree.

In *Wicks v. Milzoco Builders, Inc.,* 503 Pa. 614, 621–622, 470 A.2d 86, 90 (1983) (citations omitted), our Supreme Court explained that under a participation theory,

liability attaches where the record establishes the individual's participation in the tortious activity.

Pennsylvania law recognizes the participation theory as a basis of liability.

The general, if not universal, rule is that an officer of a corporation who takes part in the commission of a tort by

the corporation is personally liable therefore; but that an officer of a corporation who takes no part in the commission of the tort committed by the corporation is not personally liable to third persons for such a tort, nor for the acts of other agents, officers or employees of the corporation in committing it, unless he specifically directed the particular to be done or participated, or cooperated therein.

Liability under this theory attaches only where the corporate officer is an actor who participates in the wrongful acts. Therefore, corporate officers may be held liable for misfeasance.

Reviewing the dismissal of a complaint on preliminary objections, the *Milzoco Builders* Court said

the pertinent averments in these complaints can be read as setting forth, generally, that the individual appellees actually knew that the location of the proposed [development activity] created, at least, an unreasonable risk of the drainage problems which occurred and that, having the power to do so, they deliberately ordered the work to proceed.

*Id.*

The EHB, in its findings pertaining to Herzog's activities, set forth a factual situation similar to that in *Milzoco Builders*. The record reveals ample support for those findings.

The EHB found that Herzog attended the March 23, 1989 meeting and proposed a plan to dig up, haul away and replace the material on site with construction and demolition waste from New York permitted transfer stations. (Finding of Fact No. 14). Herzog's plan contemplated removing all materials other than clean, uncontaminated fill and a *de minimis* amount of wood. (Findings of Fact Nos. 13 and 14). Herzog offered a list of safeguards to ensure the dumping of clean fill. (Finding of Fact No. 15). In April 1989, after DER warned the Shays to cease dumping fill from the New York sites, Herzog accompanied Charles Shay and DER representatives to several of the New York sites to inspect the material. (Findings of Fact Nos. 16 and 17). In May, 1989, a day after

DER uncovered large pieces of wood, metals and cloth fragments in the site, Herzog attended a meeting at which these unacceptable materials were discussed and expressly rejected by DER. (Finding of Fact No. 20). Throughout the spring of 1989 and until October of that year, during which time an estimated 429,000 cubic yards of new fill were dumped, Herzog was regularly on the site and overseeing operations. (Finding of Fact No. 35).

We find each of these findings supported by substantial evidence. Department witnesses testified as to Herzog's participation in the meetings with DER in the spring of 1989, and Herzog does not dispute this testimony. A DER official testified that Herzog was on site most of the times he visited, and appeared to be overseeing the operations. The official further testified that Herzog advised him that he, Herzog, was overseeing the project and could be contacted at the site when necessary. (Notes of Testimony, July 21, 1992, pp. 150–151, 167, 171).

Although Herzog protests he was at all times acting in a representative capacity for Tri–State, we see no error in the EHB's conclusion that Herzog is liable for the cited violations of the SWMA and CSL under a participation theory. The record indicates that Herzog had knowledge of and was closely involved in dumping unacceptable fill even after DER ordered cessation. As in *Milzoco Builders*, Herzog knew of the violative activity and "having the power to do so, [he] deliberately ordered the work to proceed." *Id.*, 503 Pa. at 622, 470 A.2d at 90. Thus, the EHB correctly upheld the imposition of liability on Herzog, "the individual[,] as an actor rather than as an owner" or corporate representative. *Id.* We see no reason, and Herzog offers none, why the participation theory of liability should not apply to this instance of statutory violations equally as it does to common law tort actions. Moreover, since we have found that the evidence clearly implicates Herzog as an individual actor, we agree with the EHB that it is irrelevant that it found the exact legal status of Tri–State not to be known or that the evidence does

not show Herzog was on site every day. We will therefore affirm the EHB's decision as it applies to Herzog.

## Judith Shay

Judith Shay (Judith) argues that there is (1) no evidence to show that she was one of the owners of the property and (2) no showing that she participated in the activities thereon. These issues were not raised in the appeal to the EHB filed on behalf of Judith Shay. In fact, they were not raised until after the hearings, in a post-trial brief. However, since they were considered by the EHB, this Court will address the issues.

The EHB reasoned that because DER's previous compliance orders of March 6, 1989 and July 10, 1989 were directed to both Charles and Judith and since such orders were not appealed, Judith is "deemed responsible." We do not agree. Although Judith is bound by those orders, they cannot provide the basis for any conclusion that Judith was an owner of the property. However, there is an admission in the record that Judith was an owner. Herzog filed a preliminary memorandum in which he alleged that "[p]rior to the involvement of Tri–Corp. and Mr. Herzog, *the owners of said property, the Shays,* had already been subject to a DER order." (emphasis added). The Shays then filed a pre-trial memorandum in which they both "incorporated by reference the Pre–Trial Memorandum filed by Herzog." We therefore hold that Judith is bound by the allegation in Herzog's memorandum and was properly found to be one of the property owners.

Judith argued before the EHB that more than ownership of the land was necessary to hold her responsible for violations of SWMA. The EHB agreed and cited in support of its conclusion *Department of Environmental Resources v. O'Hara Sanitation,* 128 Pa.Commonwealth Ct. 47, 562 A.2d 973 (1989). We agree that under the circumstances of that case, this Court held that the mere ownership of the land was not sufficient. However, that case is clearly distinguishable from

the present situation. We described the activities therein as follows:

> OSC is in the business of the collection, transportation and disposal of municipal solid waste. At the garage site, OSC recycles construction and demolition waste, defined as "waste building materials, dredging materials, grubbing waste, and rubble resulting from construction, remodeling, repair, and demolition operation on houses, commercial buildings, and other structures and pavements." The construction and demolition material is dumped from roll-off containers at a specific location at the garage site. A bulldozer spreads the materials out on the ground so that recyclable materials can be hand-picked out of the pile. Approximately half of the material, including metal, cardboard and wood, is recycled; the other half is scooped up by the bulldozer, dumped into an open top trailer and transported off-site to permitted disposal sites. (O'Hara Deposition at 31, 36–37.)

*Id.* at 49–50, 562 A.2d at 974–975 (citations omitted).

We then held that the owners of the land could not by their mere ownership be held responsible. However, in this case, the Shays, by virtue of the arrangements Charles Shay made with Herzog, were bringing in and allowing to remain on their land fill material violative of the agreement with DER as well as violative of the SWMA. We hold under such circumstances their ownership of the land is sufficient to hold both owners responsible and subject to valid DER orders, despite the lack of evidence that Judith participated actively in the operations.

In *O'Hara Sanitation,* we concluded that the landowners could not be held responsible for violations of the SWMA solely on the ground that they owned the land where illegal activity occurred. In so holding, we observed that DER offered no evidence that the landowners had any knowledge of the operations occurring on the land, that the operations did or might have constituted violations of the SWMA, or that the landowners had given the processing company permission to undertake such operations. *Id.* at 54, 562 A.2d at 977. Here, the record supports the EHB's findings that the Shays under-

took to have their land filled so they could construct a parking lot for their restaurant and sought first Kelly Wall then Don Herzog and Tri–State for this project. There is a marked difference between giving permission to another to use one's land for the processing and subsequent removal of material to a proper fill site and engaging in conduct oneself which changes the condition of the land. By virtue of the described landfilling to construct a parking lot, both Shays were operating on the land and altering its condition. We therefore hold that EHB properly found both Judith and Charles Shay, with knowledge of the operations that they themselves contracted for, were liable for the cited violations of the SWMA.

### Clean Streams Law

DER's compliance order charged the Shays and Herzog with violations and cited sections 503, 601 and 611 of that act. These statutory provisions were invoked to sanction some of the same activity that DER contended violated the SWMA—specifically, operating a construction/demolition waste landfill without a permit; continuing to bring new fill onto the site despite DER directives to cease; and creating a public nuisance. Herzog was additionally cited for assisting in the transportation and dumping of solid wastes, in contravention of DER's regulations.

As we have noted, section 503 of the CSL is an omnibus provision making it a public nuisance to violate DER orders and regulations, and section 601 provides for procedures to abate nuisances and restrain violations. Section 611, in pertinent part, declares it unlawful to fail to comply with DER permitting procedures and to hinder, obstruct or interfere with DER or its personnel in the performance of their duties. In turn, Section 271.101(a) of DER's municipal waste regulations, 25 Pa.Code § 271.101, was adopted pursuant to the authority of the CSL (as well as the SWMA) and requires a permit to operate a construction/demolition waste landfill. Thus, it is also a violation of the CSL to operate such a landfill without a permit. Not surprisingly then, the same evidence on which the EHB relied to support its conclusions that the

Shays and Herzog violated the SWMA supports the conclusion that they violated the CSL. We need only repeat that the evidence discussed so far amply supports the findings that the Shays and Herzog operated a landfill and that Herzog assisted in the transporting and deposit of solid waste without permits.

In addition, there is evidence to support the finding that high levels of lead were found in fill samples of the site in July 1989. (finding of fact No. 23). The site is upgrade from the Delaware River bed and from certain wells in which high lead and other inorganic toxicity levels were found. Although the Shays and Herzog protest that DER failed to show any causal connection between that contamination and the activity on the site, they admitted in their notice of appeal to the EHB that the material brought in contained high levels of lead compared to background samples. We therefore see sufficient evidence for a finding that "pollution or a danger of pollution is resulting from a condition which exists on land." Section 316 of the CSL, 35 P.S. § 691.316.

Of course, since we have concluded that Judith Shay is an owner of this land, she is liable strictly in that capacity to correct the polluting condition. *National Wood Preservers, Inc. v. Commonwealth of Pennsylvania, Department of Environmental Resources,* 489 Pa. 221, 414 A.2d 37 (1980). The EHB correctly found that Herzog was not liable under section 316 because he is not an owner of the land.

## ORDER

AND NOW, this 19th day of July, 1994, the June 16, 1993 order of the Environmental Hearing Board at EHB Docket No. 89–500–MR is hereby affirmed.