THE AINJAR TRUST, John O. Vartan, Trustee, Petitioner,

v.

DEPARTMENT OF ENVIRONMENTAL PROTECTION, Susquehanna Township and The McNaughton Company, Respondents.

Commonwealth Court of Pennsylvania.

Argued July 10, 2002.

Decided Aug. 28, 2002.

---

Thomas W. Scott, Harrisburg, for petitioner.

David E. Lehman, Harrisburg, for respondent, McNaughton Company.

Martin R. Siegel, Harrisburg, for respondent, Dept. of Environmental Protection.

Samuel T. Cooper, Harrisburg, for respondent, Susquehanna Twp.

Before COLINS, President Judge, SIMPSON, Judge and MIRARCHI, Jr., Senior Judge.

OPINION BY Senior Judge MIRARCHI, Jr.

The Ainjar Trust, John O. Vartan, Trustee (Vartan) petitions this Court to review an order of the Environmental Hearing Board (Board) affirming the approval by the Department of Environmental Protection (DEP) of a sewage planning module for a proposed development. We affirm.

Vartan owns a tract of land in Susquehanna Township (Township) adjacent to a proposed residential development called Margaret's Grove, which is to be developed by The McNaughton Company (McNaughton). Vartan is a competing developer, who opposes the sewage planning module proposed by McNaughton for Margaret's Grove. A sewage planning module is essentially a revision to a township's existing sewage facilities plan, in this case, one that contemplates additional connections and flows from the new development. Both the Township and DEP approved the module, which would add an additional 49,290 gallons per day (GPD) from the development to the Township's existing public sewage system. Vartan appealed from the DEP's decision to approve the module, and the matter was heard by the Board. After six days of hearings, and the compilation of a huge record, the Board dismissed Vartan's appeal. The Board's 155 findings of fact are modestly summarized as follows.

The main lines of public sewerage involved in this matter are the Paxton Creek Interceptor and its two tributaries, the North and East Branches. These branches join to create a "Y" type construction that forms the interceptor. The module contemplates that sewerage from Margaret's Grove will be fed into the North Branch of the interceptor, flowing through the interceptor for eventual treatment at the Harrisburg Sewage Treatment Plant. More specifically, it contemplates that the Margaret's Grove sewer lines would connect to existing sewer facilities by gravity flow to an existing sewer line at Pheasant Hill Manhole 12–8 via an eight-inch sewer line.

McNaughton's original proposal was for a module to service 290 equivalent dwelling units (EDUs). An "equivalent dwelling unit" is a unit of measurement for volume of sewage flow, and typically one EDU will correspond to one residence. The Township zoning officer determined that all components required by a "Municipal Checklist" were present in the module. The module then was reviewed by Township Authority for technical review. The Township Authority, in turn, sent the module to CTE Engineering Services (CTE) under its contract with CTE for engineering support. CTE concluded that the Township system has sufficient capacity to accept the additional 49,290 GPD contemplated by the module. The Board accepted this opinion as fact. Finding of Fact No. 32.

The module was then modified several times as a result of the review process with the Township regarding the module and the land development process generally. The number of EDUs to be served was reduced to 186, including 156 residential units and 30 units for a proposed clubhouse. The projected GPD for each EDU were reduced from 400 GPD to 265 GPD. On August 12, 1999, the Township approved the module in its modified form, and the module was then forwarded to the DEP for its approval.

The DEP determined that the module conformed to the Township's "Act 537" sewage plan.[1] In coming to this determi-

---

1. The Township plan is governed by the Pennsylvania Sewage Facilities Act, Act of January

nation, the DEP considered several factors. First, the DEP noted that wetlands were located in the proposed Margaret's Grove development and that other DEP permits may be required prior to any construction "if encroachment to streams or wetlands will result." Finding of Fact No. 65. Second, the DEP considered the fact that future development of Margaret's Grove and surrounding areas could ultimately raise the EDU level to 1600. McNaughton was seeking approval for a module that would service only its currently proposed development, which development will occupy only a portion of its property. McNaughton previously contemplated proceeding with a larger development. The DEP noted in its approval that if McNaughton desired the construction of anything larger than an eight-inch connecting sewer line, then it would be required to submit additional plans and obtain additional permits before construction could proceed in Margaret's Grove.

The DEP also determined, as affirmed by the Board, that the module is consistent with its Chapter 94 regulations, 25 Pa. Code, Chapter 94, pertaining to municipal wasteload management. A Chapter 94 consistency determination is a part of every DEP review of an "Act 537" module submission. Finding of Fact No. 72. *See also* 25 Pa.Code § 94.14. As part of its review, the DEP considered whether the existing sewerage facilities were in an "existing hydraulic overload" or a "projected hydraulic overload."

A hydraulic overload is defined as: "The condition that occurs when the monthly average flow entering a plant exceeds the hydraulic design capacity for 3–consecutive

months out of the preceding 12 months or when the flow in a portion of the sewer system exceeds its hydraulic carrying capacity." 25 Pa.Code § 94.1.[2] If an existing overload is present, then the "permittee of the sewerage facilities," in this case, the Township Authority, shall (1) prohibit new sewer connections, except under certain circumstances; (2) immediately begin to plan and build additional sewerage capacity; and (3) submit to DEP for its review and approval, a corrective action plan (CAP). 25 Pa.Code § 94.21. If, however, an overload within the next five years is only "projected," then the permittee of the sewerage facilities shall (1) submit to the DEP a CAP within 90 days from the date of DEP's notification of the projected overload, and (2) limit new connections to and extensions of the sewerage facilities based upon remaining available capacity pursuant to the CAP. 25 Pa.Code § 94.22. The manner by which DEP determines whether there is either an existing or a projected overload is from annual reports submitted by permittees as required by 25 Pa.Code § 94.12.

By letter dated January 5, 1999, DEP notified the Township Authority that based on its most recent annual report, the North Branch of the Paxton Creek Interceptor is in a projected overload status. The letter directed the Authority to (1) submit a CAP within 90 days, indicating how the Authority will prevent the Paxton Creek Interceptor from becoming overloaded, and (2) limit new sewer connections based on available capacity and the CAP. The Township submitted its CAP on March 5, 1999, and passed a resolution limiting future sewer connections.

---

24, 1966 (1965), No. 537, *as amended,* 35 P.S. §§ 750.1–750.20a.

**2.** "Overload" may pertain to either a hydraulic or an organic overload. The Board determined that the issues raised by Vartan's appeal of the DEP's approval of the module pertained only to a hydraulic overload. Finding of Fact No. 76.

The module submitted to DEP includes a section completed by the Township Authority regarding whether the module is consistent with Chapter 94, and it asks the Authority to state whether the proposed sewer extensions and tap-ins will create a hydraulic overload within five years on any existing collection or conveyance facilities that are part of the existing system. In completing this section, the Authority set forth the average and peak sewage flows for the Paxton Creek Interceptor. The "Design and/or Permitted Capacity" table indicates that the average conveyance flow of the interceptor is 5.7 million gallons per day (MGD) and that its peak flow is 14.2 MGD. The "Present Flows" table lists the average flow as 4.0 MGD, with the peak as 16 MGD for normal wet weather conditions, and 22-MGD for "extreme wet weather conditions." The "Projected Flows in 5 years" table lists the average projected flow as 3.8 MGD, with the peak as 16 MGD.

The Board noted that these numbers are averages, that the monthly numbers are not set forth, and that therefore the module does not establish that the interceptor has exceeded its hydraulic design capacity for three consecutive months out of the preceding twelve months. Because of this fact, the Board rejected the testimony of Vartan's expert witness that the module on its face shows that the interceptor is operating at an existing overload condition. The Board also noted that the hydraulic carrying capacity of a system is greater than its design capacity, and under pressure a pipe can carry additional flow beyond that for which it was originally designed. Findings of Fact Nos. 102–103. The Board accepted the Authority's conclusion that its facilities could operate at a hydraulic carrying capacity of 17 MGD before an overflow or spillage would occur. Finding of Fact No. 105. It did note, however, that the 22-MGD flow for "ex-

treme wet weather" did exceed the design and hydraulic carrying capacity of the system. For this reason, the Authority gave a "qualified no" to the question on the module as to whether the proposed sewer extensions and tap-ins will create a hydraulic overload within five years on any existing collection or conveyance facilities that are part of the existing system. The Authority noted that only in "extreme wet weather" would there be flows in excess of the hydraulic carrying capacity of the system.

The Board found with regard to this latter point, however, that periods of extreme wet weather are "extraordinarily rare and would occur only in very unusual wet weather conditions." Finding of Fact No. 110. The Board noted that an overflow event related to wet weather occurred only once on the entire Paxton Creek Interceptor. This event occurred on the main trunk on the system, not the North Branch. The Board rejected as not credible Mr. Vartan's personal testimony on rebuttal that he observed an overflow in his driveway. The Board found that there was no other evidence to confirm this allegation, and that Mr. Vartan's testimony indicated a clog rather than a hydraulic overflow. Moreover, expert testimony found credible by the Board refuted Vartan's contentions of an existing overflow situation.

The Board ultimately determined, with respect to the Chapter 94 regulations, that the anticipated flow from the module would not be a source of overflow in the event of extreme wet weather even if such a condition would occur. The Board concluded that the module was not inconsistent with Chapter 94.

The Board also made relevant findings regarding the public notice provided with respect to the module. The module as

originally submitted to the Township was advertised in the *Harrisburg Patriot News* on December 11, 1998. This notice announced that Township residents had thirty days during which they could submit written comments regarding the module. The Board found that Mr. Vartan knew about the module submission no later than December 16, 1998 and that he received all module materials by January 29, 1999. The Board also specifically found that Mr. Vartan actively participated in the public input process during the entire time the Township reviewed the module and even after the Township approved the module on August 12, 1999. By a "Dear Neighbor" letter dated December 18, 1999, Mr. Vartan sought to engage public interest in the module.

By July 23, 1999, Vartan knew that the Margaret's Grove project had changed from 26.6 to 36.68 acres, and that the number of residential dwelling units had been reduced from 222 to 156. The Board specifically found that changes made to the module "were not so fundamental that the combined changes represented a new or completely different module." Finding of Fact No. 141. The Board also found that DEP had considered Mr. Vartan's comments when it reviewed the module prior to approval. The Board set forth the scope of contact between Mr. Vartan and DEP's Planning Project and Finance Manager. In consideration of Mr. Vartan's comments, DEP sent a letter to the Township requesting a response to the public comments received. The Township responded to each of Mr. Vartan's comments by way of letter from the law firm representing McNaughton. The Board found that it was appropriate for the Township to request that McNaughton's firm respond to Mr. Vartan's comments. DEP reviewed the comments from Mr. Vartan and the response thereto. The Board thus specifically found that Vartan was not deprived of access to the module.

■ Based on the above findings of fact, the Board, in a forty page "Discussion," rejected all of Vartan's challenges to DEP's approval of the module and determined that such approval was consistent with DEP's regulations. This petition for review followed. Our scope of review of an order of the Board is whether the Board committed an error of law or a constitutional violation, or whether any necessary findings of fact are not supported by substantial evidence. *Oley Township v. Department of Environmental Protection*, 710 A.2d 1228 (Pa.Cmwlth. 1998).

Vartan argues that the Board erred by (1) not shifting the burden of proof and production to DEP after Vartan allegedly produced evidence of environmental harm from the approval of the module; (2) holding that adequate public notice had been given; (3) holding that the module was consistent with the Chapter 94 Municipal Waste Management Load Program; and (4) holding that the module was not deficient despite alleged proof of a segmented development and an ultimate need for ten to twelve-inch pipes rather than the eight-inch pipe proposed.

Before addressing these arguments, we must express our displeasure with Vartan's brief. First, Vartan's "Statement of Facts" bears slight relation to the facts as found by the Board, or to a general summary of the evidence, but is, essentially, additional legal argument. Second, Vartan's actual legal argument is in many respects an argument on the evidence, asking this Court to draw findings of fact different from those found by the Board. In fact, Vartan appears at times to have forgotten that it is addressing this Court or any appellate body. On page 58 of its brief to this Court, Vartan states: "This

**488**

*Board should find* that the [DEP] improperly reviewed the Margaret's Grove submission as existing in a projected hydraulic overload environment, when in fact, an actual hydraulic overload exists...." (Emphasis added.)[3] More important than Vartan's sloppiness in execution, is its disregard of the fundamental legal principle that the Board is the finder of fact and has sole discretion regarding witness credibility, weight of the evidence, and resolution of conflicts of evidence. *Herzog v. Department of Environmental Resources,* 166 Pa. Cmwlth. 114, 645 A.2d 1381 (1994).

Because Vartan did not specifically challenge any finding of fact or make any constitutional arguments, its arguments are all legal challenges to conclusions drawn from the facts as found by the Board. These legal challenges are all without merit.

■ Vartan first argues that the Board erred by not shifting the burden of proof and production to DEP after Vartan allegedly produced evidence of environmental harm from the approval of the module. This argument arises from a series of cases stemming from *Marcon v. Department of Environmental Resources,* 76 Pa. Cmwlth. 56, 462 A.2d 969 (1983). In *Marcon,* we observed, with approval, that the Board shifted the burden of "going forward with the evidence" to DEP once the objectors presented "credible" expert scientific evidence that "tended to show" that DEP's action "would have a serious and deleterious effect" upon the environment

and environs. *Id.* at 971.[4] Vartan argues that it produced sufficient evidence of potential serious environmental harm as a result of DEP's approval of the module based on the testimony of its expert witnesses, Dr. Archer and Mr. Vartan. Vartan contends that the Board erred by not shifting the burden of "proof" to DEP once these witnesses delivered their "compelling" testimony.

There are several difficulties with this argument, however. The principal difficulty is that the Board specifically found, with stated reasons, that the testimony of Dr. Archer and Mr. Vartan was not credible, let alone compelling. Further, the testimony of these witnesses did not explain how the approval of the module would have a serious and deleterious effect upon the environment or the area. At worst, Dr. Archer opined that the existing system was in hydraulic overload. Aside from the fact that the Board determined otherwise, the Board further found that a hydraulic overload does not establish that an overflow would result. Thus, Vartan's argument is wholly without merit.

■ Vartan next argues that the Board erred by holding that adequate public notice had been given. This argument is based, in part, on factual allegations without citation to the record (and, like many of Vartan's arguments, without reference to the Board's actual findings of fact) that Vartan received only sketchy information regarding the module from the Township.

---

3. Similarly, on page 53 of its brief, Vartan makes mention that the Township's CAP "is currently in litigation before this Honorable Board."

4. In *Concerned Residents of the Yough, Inc. v. Department of Environmental Resources,* 162 Pa.Cmwlth. 669, 639 A.2d 1265 (1994), we cited *Marcon* as holding that when an objector to DEP action produces credible evidence, the *burden of proof* shifts to DEP to justify its

action. Clearly, *Marcon* holds only that the burden of production, not the burden of proof shifts; thus *Concerned Residents* misconstrued *Marcon.* Vartan's reliance upon *Concerned Residents* as standing for the principle that the burden of *proof* shifts to DEP once the objector produces credible scientific evidence of possible environmental harm, is therefore misplaced.

It is also based on the fact that the module as approved is different in certain respects than it was when first proposed, at the time of public notice. Vartan does not describe these differences in any detail except in his reply brief. More importantly, however, Vartan does not describe how he was actually prejudiced in properly commenting on the module in light of these differences or in light of any other alleged impropriety.

Here, the Board made detailed findings of fact regarding the public notice, Vartan's receipt of information concerning the module, and Vartan's participation in the review process. The Board found that Vartan had access to all pertinent information, that Vartan participated in the process, that DEP considered Vartan's comments to the module before deciding whether to approve it, and that any changes made to the module over the relevant time were not consequential. Aside from the fact that Vartan failed to make any formal challenge to these findings of fact, its argument contains nothing that indicates that these findings are not supported by substantial evidence.[5] Vartan appears to be improperly seeking different findings of fact. Further, Vartan does not describe how the Board erred, as a matter of law, by concluding that the differences occurring to the module were not significant.[6] Vartan's argument is therefore wholly without merit.

■ Vartan next argues that the Board erred by not determining that the Harrisburg Water Treatment Plant and the Township Conveyance System are in actual hydraulic overload status. Vartan contends that these systems are in actual hydraulic overload, in part, because of notations on the module description and, in part, on testimony from Vartan's witnesses that the Board did not find credible. The notation that Vartan refers to on the module description is that which indicates that the system will overload in periods of "extreme wet weather." Vartan also argues that the testimony of DEP's witnesses support his position. This latter argument is incorrect, as one witness testified to only a *projected* hydraulic overload for the Paxton Creek Interceptor and that, pursuant to 25 Pa.Code § 94.22, a CAP was prepared to address that situation. Further, although DEP's witnesses acknowledged that there might in the future be some overflow or spillage in the system, such overflow would not be to the point where it will cause environmental harm. Vartan contends, however, that because of the potential for spillage, the module should not have been approved pursuant to Chapter 94 and that the DEP was subjectively applying this chapter and, indeed, inventing new looser regulations outside of the regulatory process. This latter argument is based on the DEP's assessment that no environmental harm will result

5. Vartan states, without citation to any evidence of record, and in total contradiction to the Board's findings of fact, that no critical public comments were forwarded to DEP prior to its approval of the module. Yet, Vartan later admits that Mr. Vartan personally discussed his criticisms of the module with DEP's Planning Project and Finance Manager. Vartan's method of tossing off "factual" statements in its brief, that are not found in and even contradictory to the Board's findings, without making any citation to the record, is wholly inappropriate.

6. Moreover, Vartan's principal objection to the module is that the existing system cannot safely accommodate the increase in sewage flow arising from Margaret's Grove. The changes in the module, however, if anything demonstrate that the module as approved has been scaled down considerably from its originally proposed capacity, for example, from 88,800 GPD to 49,290 GPD, and from 290 EDUs to 186 EDUs.

from adding the module to the existing system, and thus DEP determined that the module might be approved.

Vartan's argument fails to acknowledge that the Board made numerous findings of fact regarding the issue of hydraulic overload and that based on these findings, concluded that the module's approval is not inconsistent with Chapter 94. The Board's findings are conclusive because of Vartan's failure to challenge them; moreover, they are based on evidence of record. Vartan's argument, on the other hand, is based to a large degree on evidence that the Board either specifically found to be not credible, or if credible, was given a different interpretation by the Board. Again, this Court is not a fact-finding tribunal on petitions for review from the Board. Thus, to the extent Vartan's argument is an appeal to this Court to reweigh the evidence and draw findings of fact that conflict with those of the Board,[7] the argument is wholly inappropriate.

■ We have previously set forth a summary of the Board's findings of fact regarding its determination that the North Branch of the Paxton Creek Interceptor was in projected, not actual hydraulic overload, that the Township submitted a CAP regarding such projected overload, that the system could accommodate the module, and that the approval of the module was not inconsistent with the requirements of Chapter 94. To this, we add that the Board also determined in its "Discussion" that the regulations, on their face, do not prohibit approval of a module even if there is an actual hydraulic overload present. At most, an actual hydraulic overload would only prohibit, generally, "new connections" to the overloaded facili-

ties. 25 Pa.Code § 94.21(a)(1). As the Board observed, the approval of a module is a separate matter from the later step of approving a new connection to the system. Vartan has provided no authority that refutes this interpretation.[8] More importantly, Vartan's argument hinges upon a determination that an actual hydraulic overload exists, while the Board, based upon credible substantial evidence of record, determined that the relevant system was only in projected overload and that the DEP was acting within the boundaries of its regulations. Vartan's argument is therefore without merit.

■ Finally, Vartan argues that McNaughton is "impermissibly" seeking approval for segmented development. That is, Vartan contends that McNaughton ultimately intends a development of 417 to 600 units, but is now only contemplating 156 units and a sewer capacity for that smaller number. Vartan further contends that McNaughton's sewer needs will ultimately require easements, 1300 feet of new interceptor line, a ten-inch rather than an eight-inch line, and a twelve-inch interceptor rather than the existing ten-inch one. Vartan contends that DEP failed to consider these "facts" prior to approving the proposed module, in alleged violation of 25 Pa.Code § 71.52(a)(2), which requires the DEP to consider the surrounding development. Vartan also argues that for a development of the size actually contemplated, a water quality management permit is required, but was not issued by the DEP in this instance.

A review of the Board's decision reveals that DEP certainly *did* consider the possibility of the future expansion of Margaret's

---

7.  *See, e.g.,* Vartan's Brief, p. 58.

8.  Of course, DER's interpretation of its own regulations is entitled to deference and should not be disregarded unless clearly erroneous.

*Mathies Coal Co. v. Department of Environmental Resources,* 522 Pa. 7, 559 A.2d 506 (1989).

Grove. As the Board observed, however, the Board's case law recognizes and allows for "phased development," in part on the basis that possible future development does not equate to a realization of such development. The Board also determined that if Margaret's Grove were to expand, then McNaughton would be forced to obtain all necessary permits. Clearly, the Board did not err by not reversing DEP's approval of the module based on the possibility that there may be future development, and when the developer is on notice that any expansion will require a separate approval process.

For the above reasons, the Board's order is affirmed.

Judge SIMPSON concurs in result only.

### ORDER

AND NOW, this 28th day of August, 2002, the order of the Environmental Hearing Board in the above-captioned matter is hereby affirmed.