**Miguel A. MARRERO, M.D., Petitioner**

v.

**COMMONWEALTH of Pennsylvania, BUREAU OF PROFESSIONAL AND OCCUPATIONAL AFFAIRS, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Oct. 17, 2005.

Decided Nov. 30, 2005.

Ordered Published Feb. 07, 2006.

Stanton D. Levenson, Pittsburgh, for petitioner.

Sabina I. Howell, Counsel, State Board of Medicine, Harrisburg, for respondent.

BEFORE: McGINLEY, Judge, and PELLEGRINI, Judge, and KELLEY, Senior Judge.

OPINION BY Judge McGINLEY.

Miguel A. Marrero, M.D. (Petitioner) petitions for review of the State Board of Medicine's (Board)[1] Final Adjudication and Order issued on January 26, 2005, which placed his license on probation, imposed a civil penalty in the amount of $10,000, and ordered him to complete a course on physician/patient boundaries.

Petitioner is a forty-six year old obstetrician and gynecologist who specializes in reproductive endocrinology. In 1992, K.T. (wife) and the complainant, S.T.[2] (husband), came under the care of Petitioner for infertility problems. With Petitioner's professional help the couple had twins. In 1996, K.T. started working for Petitioner in a clerical position. S.T. and K.T. continued in Petitioner's care and had a third child in 1996, and their youngest child in 1999.[3]

On June 25, 2001, S.T. filed a complaint with the Board and alleged that Petitioner and his wife had a sexual relationship while Petitioner was treating the couple for infertility problems.

The Commonwealth of Pennsylvania Bureau of Professional and Occupational Affairs (Commonwealth) conducted an investigation. An order to show cause was issued on July 10, 2003, alleging that Petitioner engaged in unprofessional conduct in the treatment of a patient. Petitioner filed an answer denying any misconduct. A hearing was held on January 12, 2004.

The Commonwealth presented the testimony of S.T. who testified that both he and his wife first became patients of Petitioner in 1992 for fertility problems. S.T. and K.T. visited Petitioner's office "many times" throughout K.T.'s pregnancies. Notes of Testimony (N.T.), January 12, 2004, at 14. Throughout each of the couple's pregnancies, Petitioner regularly analyzed S.T.'s semen, discussed the results with him, referred S.T. to a specialist and prescribed him antibiotics on at least one occasion. N.T. at 15. Petitioner concluded that S.T.'s sperm count and mobility were not the cause of the couple's infertility problem. N.T. at 15–16. As the result of Petitioner's care, K.T. and S.T. had four children between 1993 and 1999. K.T. continued to see Petitioner after her pregnancies as her obstetrician/gynecologist.

In 1996, when K.T. was pregnant with their third child, Petitioner asked K.T. to come to work for him as his office manager. N.T. at 17. Petitioner continued to treat K.T. after she was hired.

In the summer of 1999, S.T. noticed a change in Petitioner's behavior towards his wife. S.T. saw Petitioner attempt to kiss K.T. on the lips at her father's funeral. Petitioner also began calling the family's residence and sending K.T. personal e-mails to the family's mailbox. N.T. at 20–21. In August of 1999, Petitioner made arrangements for S.T. to attend a conference with him in Toronto, Canada. N.T. at 22. When K.T. returned from the trip, she admitted to S.T. that she and Petitioner kissed. S.T. told K.T. that if she wanted to save their marriage, she should stop working for Petitioner. N.T. at 25. On October 24, 1999, K.T. wrote a letter of resignation to Petitioner stating that her

---

1. State Board of Medicine is the agency charged with responsibility and authority to oversee medical profession and to determine competency and fitness of applicant to practice medicine within the Commonwealth. *Barran v. State Bd. of Medicine,* 670 A.2d 765 (Pa.Cmwlth.1996).

2. The initials of the complaining party/patients were used to protect their privacy.

3. The complaint also alleged that Petitioner failed to keep medical records which pertained to his treatment of S.T.

last day of employment would be December 3, 1999. At that time, her yearly salary was $36,000. N.T. at 25–26.

In an effort to persuade K.T. to remain employed as his office manager, Petitioner offered to pay K.T. $104,000 per year. Letter to K.T. from Petitioner, October 25, 1999, at 1. When K.T. declined that offer, Petitioner offered to pay K.T. the difference between her then-current salary and $104,000, which would be deposited into a money market account under the professional corporation's name and assigned to her so that she could have access to it whenever needed. Letter to K.T. from Petitioner, October 29, 1999, at 1. K.T. also declined that offer.

On December 3, 1999, Petitioner left the following message on S.T.'s answering machine:

Hi [S.T]. This is Dr. Miguel Marrero calling. It is about 4:05 p.m. today, Friday, December 3rd. The reason I was calling you is I wanted to uh, uh, let you know about the affair that [K.T.], your wife, has been having with me, uh, for the last, uh, probably, 4 or 5 months, uh, which uh, obviously, um, we had sex together. Uh, so uh, I will, uh, be e-mailing you, um, some more information on your e-mail at home. Um, also uh, feel free to call me so I can tell you all the details, uh, which your sweet darling [K.T.], is not that innocent just the way you suspected. She has been having an on-going affair with me going back to August of 1999 and uh, also including sleeping with me every single night uh, in Toronto. Uh, also, in many other instances. So, uh, if you want all the gory details, I will be more than happy to provide them to you. So, have a good weekend.

Transcript of Telephone message transcribed December 9, 2003.

On that same day, Petitioner e-mailed S.T. a photograph of himself and K.T. holding hands in Toronto. Petitioner subsequently called K.T. on her home phone at least five times in December of 1999, and continued to call and meet K.T. until she eventually went back to work for him. K.T. separated from S.T. in June of 2000, and divorced him on September 12, 2002. K.T. became engaged to Petitioner and she continued to work as his office manager.

Petitioner testified on his own behalf as did K.T. and six character witnesses. K.T. testified in order to conceive each of her children she had to visit Petitioner as a fertility specialist and that S.T. accompanied her to some of her appointments. N.T. at 106–107. K.T. testified that she and Petitioner ended their physician/patient relationship on December 3, 1999, the date she resigned from her employment. N.T. at 96–97. She stated that she and Petitioner did not have sex prior to December 3, 1999, and that the first time she had a sexual relationship with Petitioner was in July of 2000, after she returned to his employ. N.T. at 98.

Petitioner testified that he did not have sex with K.T. before December 3, 1999, which is the date he claimed their physician/patient relationship ended. He testified that his sexual relationship with K.T. began in July of 2000, and that he lied during the message he left on S.T.'s answering machine because he was "very angry and very upset." N.T. at 129–132. Petitioner denied that S.T. was his patient although he accompanied K.T. on a handful of appointments. N.T. at 124. Petitioner wrote S.T. a prescription for an antibiotic but claimed it was in the treatment of K.T., not S.T. N.T. at 126–127. Petitioner also admitted that he ordered several semen analyses, but again, claimed that this was pursuant to his treatment of K.T. N.T. at 128, 138.

In order to establish when Petitioner's relationship with K.T. began, S.T. offered the transcript of the support hearing conducted before the Court of Common Pleas of Allegheny County with respect to S.T. and K.T.'s divorce proceeding. Petitioner was subpoenaed in that case and admitted under oath that his affair with K.T. commenced in August of 1999, and was ongoing. Support Hearing Testimony, January 23, 2001, at 20–22. K.T. also testified at that hearing that her romantic relationship with Petitioner began when they went to the conference in Toronto, Canada. Support Hearing Transcript, January 23, 2001, at 45.

On October 28, 2004, the hearing examiner filed his adjudication and order. He concluded that Petitioner was "guilty of immoral and unprofessional conduct" in his professional relationship with K.T. and S.T. who were his patients. He assessed a $4,000 penalty and a three-year license suspension with the suspension stayed in lieu of probation.

Both parties filed applications for review. On January 26, 2005, the Board adopted the findings of fact, conclusions of law and discussion but determined that the sanction set forth by the hearing examiner was not appropriate. Noting the seriousness of the unprofessional conduct of Petitioner, the Board increased the civil penalty to $10,000 and ordered Petitioner to complete a course in physician/patient boundaries within 12 months from the date of its order.

 Petitioner raises one issue for our review[4]: "Is Petitioner guilty of immoral and/or unprofessional conduct ren-

dering him subject to disciplinary action pursuant to [Section 41(8) of the Medical Practice Act (Act)] 63 P.S. § 422.41(8)?[5]"

Section 41(8) of the Act provides in pertinent part:

§ 422.41. Reasons for refusal, revocation, suspension or other corrective actions against a licensee or certificate holder

The board shall have authority to impose disciplinary or corrective measures on a board-regulated practitioner for any or all of the following reasons:

* * *

(8) *Being guilty of immoral or unprofessional conduct.* Unprofessional conduct shall include departure from or failing to conform to an ethical or quality standard of the profession. In proceedings based on this paragraph, actual injury to a patient need not be established. (Emphasis added).

(i) The ethical standards of a profession are those ethical tenets which are embraced by the professional community in this Commonwealth.

(ii) A practitioner departs from, or fails to conform to, a quality standard of the profession when the practitioner provides a medical service at a level beneath the accepted standard of care. The board may promulgate regulations which define the accepted standard of care. In the event the board has not promulgated an applicable regulation, the accepted standard of care for a practitioner is that which would be normally exercised by the average professional of the same kind in this Commonwealth under the circumstances, including local-

---

4. The scope of the Commonwealth Court's review of decision of the State Board of Medicine is limited to determining whether necessary findings of fact are supported by substantial evidence in record and whether there was error of law or constitutional violation. *Pis-*

*nanont v. State Bd. of Medicine,* 680 A.2d 911 (Pa.Cmwlth.1996).

5. Act of December 20, 1985, P.L. 457, *as amended,* 63 P.S. § 422.41(8).

ity and whether the practitioner is or purports to be a specialist in the area. 66 P.S. § 422.41(8).

Petitioner asserts that S.T. failed to show by a preponderance of the evidence that he was guilty of immoral and/or unprofessional conduct. Specifically, Petitioner claims that (1) S.T. failed to establish by a preponderance of the evidence that he was guilty of immoral and unprofessional conduct in his professional relationship with K.T; and (2) there was no doctor/patient relationship between him and S.T. (the husband), therefore, he was not guilty of immoral or unprofessional conduct with regard to S.T. This Court rejects both arguments.

The Section 41(8) of the Act provides that a practitioner may be disciplined for "immoral or unprofessional conduct." 63 P.S. § 422.41(8). Although the Act and the Board's regulations do not delineate conduct that is unprofessional, the Act does provide that unprofessional conduct includes the departure from or the failure to conform to an ethical or quality standard of the profession. In addition, the Act further provides that where the Board has not promulgated an applicable regulation, the practitioner is held to the standard of care normally exercised in this Commonwealth. 66 P.S. § 422.41(8)(ii).

The Board, which is entitled to deference in its determination of what constitutes "unprofessional conduct," concluded that a physician's sexual relationship with a person who is concurrently his patient constitutes immoral and unprofessional conduct. This Court does not hesitate to find that there was sufficient competent evidence to support the Board's conclusion. Simply stated, the Board did not believe Petitioner's version of events. Petitioner provided testimony before a previous judicial tribunal that conflicted with his testimony at the hearing in the instant matter.

Further, the testimonial and documentary evidence, namely the photograph Petitioner sent to S.T., and the transcript of Petitioner's phone message to S.T., seriously undermined Petitioner's version of the facts that he did not have an affair with K.T. while she was his patient.

 As the ultimate fact finder, the Board may accept or reject testimony of any witness in whole or in part, and this Court is bound by Board's credibility determinations. *Barran v. State Bd. of Medicine*, 670 A.2d 765 (Pa.Cmwlth.1996). This Court may not reweigh evidence presented or judge the credibility of witnesses. *Id.* Nor may this Court substitute its judgment for that of the Board if the penalty imposed for doctor's violation of the Act was reasonable. *Starr v. State Bd. of Medicine*, 720 A.2d 183 (Pa.Cmwlth. 1998).

We also reject Petitioner's claim that he did not act unprofessionally or immorally with respect to S.T. The record establishes that S.T. and K.T. sought Petitioner's expertise *as a couple* for treatment of their fertility problems in the hope of building a family. Clearly, in the case of a married couple, the treatment of infertility requires the participation of both the male and the female, and the consideration of the couple as a unit. In order to know whether conception was possible, Petitioner ordered tests of S.T., reviewed those tests, gave S.T. the results of those tests and at one point even prescribed S.T. medication. For each pregnancy, Petitioner routinely counseled and instructed both S.T. and K.T. on the *in vitro* fertilization process. By K.T.'s own admission, it was only through Petitioner's expertise and assistance that she was able to bear the couple's four children.

Petitioner's sexual relationship with S.T.'s wife which began in August of 1999

grew directly out of his treatment of S.T. and K.T. as a couple. There is no question that this constituted unprofessional and immoral conduct. This Court agrees with the Board's conclusion that Petitioner committed a serious violation of the Act and the penalty imposed by the Board was reasonable.

The order of the Board is affirmed.

## ORDER

AND NOW, this 30th day of November, 2005, the order of the Commonwealth of Pennsylvania State Board of Medicine's order in the above-captioned case is hereby affirmed.