**Dariusz KOSCIELNIAK, MD, Petitioner**

v.

**BUREAU OF PROFESSIONAL AND OCCUPATIONAL AFFAIRS, STATE BOARD OF MEDICINE, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs June 1, 2007.

Decided June 29, 2007.

James C. Sargent, Jr., West Chester, for appellant.

Sabina I. Howell, Counsel and Albert H. Masland, Chief Counsel, Harrisburg, for respondent.

BEFORE: SMITH–RIBNER, Judge, PELLEGRINI, Judge, and LEAVITT, Judge.

OPINION BY Judge PELLEGRINI.

Dariusz Koscielniak, M.D. (Doctor) appeals from an order of the State Board of Medicine (Board) finding that his treatment of Sonia Williams (Patient) fell below the accepted standard of care.

Doctor has been engaged in the practice of internal medicine through East Brown Medical Associates in East Stroudsburg, Pennsylvania, since 1997. Because Patient had turned 40 years of age, during her first examination with Doctor on April 18, 2000, she asked to be referred to a radiology facility for an initial bilateral mammogram screening. On May 24, 2000, she underwent a mammogram, and the staff at the radiology facility informed Patient that the screening results would be reported to Doctor and that his office would contact her if there was reason to be notified. Following the screening, the doctor preparing the mammogram report recommended additional imaging evaluation due to a "five mm in diameter speculated density within the mid portion of the right breast for which spot compression craniocaudal and mediolateral oblique views should be performed in initial further evaluation." (Proposed Adjudication and Order of July 28, 2006 at 3.) Doctor received the May 24, 2000 mammogram results and informed Patient that a follow-up screening was necessary.

In response to Doctor's notification, Patient scheduled her follow-up diagnostic mammogram at the same radiology facility and underwent the exam on June 7, 2000. Again, the facility's staff stated that the results of the screening would be reported to Doctor, and she would be contacted by his office if problems were present. The report of Patient's June 7, 2000 mammogram, which Doctor received, contained the following analysis:

1. PROBABLY BENIGN, 5 MM NODULAR DENSITY IN THE CENTRAL PORTION OF THE RIGHT BREAST AND THREE SMALLER PROBABLY BENIGN NODULAR DENSITIES IN THE INFERIOR ASPECT OF THE RIGHT BREAST.

2. SIX–MONTH FOLLOW UP MAMMOGRAM OF THE RIGHT BREAST IS RECOMMENDED.

(Proposed Adjudication and Order of July 28, 2006 at 3.) What is at issue in this case is whether Doctor failed to notify Patient of the results of this mammogram.

After the June 7, 2000 screening, Doctor treated Patient on six different occasions from September 2000 to July 2001 for various medical issues unrelated to the mammogram, including smoke inhalation, an upper respiratory infection and a

sprained ankle. On December 3, 2001, Doctor's office requested that the radiology facility schedule a routine mammogram for Patient, and one was performed on December 17, 2001. The results of the screening stated:

THERE HAS BEEN AN INCREASE IN SIZE OF THE MULTIPLE ROUNDED STRUCTURES IN THE INFERIOR MEDIAL ASPECT OF THE RIGHT BREAST SINCE STUDY DATED 5/24/00. THE PATIENT SHOULD RETURN FOR COMPRESSION SPOT VIEWS AS DISCUSSED ABOVE AND AN ULTRA SOUND OF THE RIGHT BREAST.

(Proposed Adjudication and Order of July 28, 2006 at 4.) Once Doctor received the results, he contacted Patient and informed her that a suspicious lesion was found requiring addition medical attention.

Patient then underwent a diagnostic mammogram which showed that the lesion was increasing in density, and a biopsy was necessary to determine whether the lesion was cancerous. Doctor referred Patient to a general surgeon who conducted a biopsy of her right breast which showed a Stage Two Infiltrating Papillary Carcinoma. Patient then had two surgical procedures at the Memorial Sloan Kettering Cancer Center in New York in March 2002 to remove the tumor, completed radiation therapy, and in March 2005, underwent reconstructive surgery.

On June 27, 2005, an Order to Show Cause (OSC) was filed against Doctor by the Department of State alleging that because he failed to notify Patient about the results of the June 7, 2000 mammogram and inform her to seek a follow-up screening, he was subject to disciplinary measures because his actions constituted a departure from the accepted standard of care a doctor owed to a patient under Section 41(8) of the Medical Practice Act,[1] as well as Sections 905 and 908 of the Medical Care Availability and Reduction of Error Act.[2] Doctor filed an answer to the OSC, and a hearing was conducted before a Board-appointed Hearing Examiner.

Testifying on behalf of the Commonwealth, Patient recounted that she initially asked Doctor about having a mammogram in April 2000, and one was scheduled for her in May 2000. She stated that she was

---

1. Act of December 20, 1985, P.L. 457, *as amended*, 63 P.S. § 422.41(8). This section provides:

> The board shall have authority to impose disciplinary or corrective measures on a board-regulated practitioner for any or all of the following reasons:
>
> (8) Being guilty of immoral or unprofessional conduct. Unprofessional conduct shall include departure from or failing to conform to an ethical or quality standard of the profession. In proceedings based on this paragraph, actual injury to a patient need not be established.
>
> (i) The ethical standards of a profession are those ethical tenets which are embraced by the professional community in this Commonwealth.
>
> (ii) A practitioner departs from, or fails to conform to, a *quality standard* of the profession when the practitioner provides a medical service at a level beneath the accepted standard of care. The board may promulgate regulations which define the accepted standard of care. In the event the board has not promulgated an applicable regulation, the accepted standard of care for a practitioner is that which would be normally exercised by the average professional of the same kind in this Commonwealth under the circumstances, including locality and whether the practitioner is or purports to be a specialist in the area.

2. Act of March 20, 2002, P.L. 154, *as amended*, 63 P.S. §§ 1303.905 and 1303.908. Section 905 provides:

> If the licensure board determines, based on actions taken pursuant to section 904, that a physician has practiced negligently, the licensure board may impose disciplinary sanctions or corrective measures.

given the results of this exam by Doctor's office and understood that a second mammogram was necessary. After receiving a referral for another mammogram to be performed in June 2000, Patient said that the radiology facility stated that Doctor would discuss the results with her, but she maintained that Doctor never informed her of any problem with the exam. When asked why she had not contacted Doctor regarding the results of the June 2000 screening after she had not heard from him, Patient testified that Doctor was "her doctor and he would contact me again as he contacted me before." (Reproduced Record at 65a.) Patient further testified that she visited Doctor six times for various medical problems beginning in September 2000, and she strictly complied with the treatments Doctor had recommended for each condition. She stated, however, that during these visits, Doctor did not discuss the findings of the June 2000 mammogram, and she denied telling Doctor that she did not want to undergo a follow-up mammogram until she lost weight. Patient also stated that she sought a referral from Doctor in August 2001, but at this time, she still was not notified of the abnormal results of the preceding diagnostic mammogram.

The Commonwealth also submitted Patient's medical records, including those from Doctor's office which failed to disclose whether she had been informed about the results of the June 7, 2000 mammogram and the need for a follow-up, as well as an expert report prepared by Jonathan Maltz, M.D. (Dr. Maltz). In the report, Dr. Maltz stated that Doctor did not inform Patient of the developing abnormality in her right breast and the need for a follow-up mammogram in six months after the June 7, 2000 screening. He also specified that "when a physician orders a mammogram and the radiologist recommends that the study be repeated in six months,

the standard of care requires that the physician take reasonable steps to ensure that this recommendation is carried out." (Reproduced Record at 24a.) Dr. Maltz then opined that to a reasonable degree of medical certainty that Doctor deviated from this standard of care.

In defense, Doctor testified that after receiving the results from the May 24, 2000 mammogram, he telephoned Patient and notified her that the results were abnormal and additional studies were necessary. He explained that she received a mammogram on June 7, 2000, and he received the results of the screening as evidenced by his initials located on the report documents. Contrary to Patient's testimony that she was not informed of the June 7, 2000 mammogram, Doctor stated that he contacted Patient and informed her of what the mammogram results were and her need for a follow-up to be performed in six months. He then testified that he treated Patient several times following her initial visit in April 2000, and that he discussed the June 7, 2000 mammogram reports with her during every visit and urged her to undergo a six-month follow-up. Regarding a specific visit in January 2001, Doctor stated that after informing Patient about the need for a follow-up mammogram, she stated that she desired to lose weight before having another screening because her prior exam caused her discomfort. Doctor also denied having knowledge that Patient had contacted his office in August 2001 to schedule a yearly mammogram.

Doctor also offered an expert report prepared by Bruce G. Silver, M.D. (Dr. Silver) that acknowledged that Doctor failed to document his conversations with Patient, but opined that this did not constitute a deviation from the accepted standard of care.

Finding Patient to be more credible than Doctor, the Hearing Examiner concluded that Doctor had not advised Patient of the need for a follow-up mammogram within six months of the June 7, 2000 exam and that this was a deviation from the generally accepted standard of care. While noting that Patient's and Doctor's testimonies directly conflicted as to whether Patient was informed of the results of the diagnostic mammogram and the need for a follow-up screening, the Hearing Examiner found Patient more credible than Doctor. He did so because Doctor failed to note in Patient's records that he had informed her about the June 7, 2000 mammogram's results. Moreover, despite his contention that he similarly did not note the results of the May 24, 2000 exam in her charts, Patient, nevertheless, complied with Doctor's recommendations following that screening demonstrating that she was a compliant patient. He also reasoned that the fact that Patient promptly complied with the recommended diagnostic mammogram in June 2000 was inconsistent with Doctor's testimony that she would have delayed the six-month follow-up screening to lose weight due to the discomfort of the procedure. In addition, the Hearing Examiner found Patient's overall demeanor more convincing than Doctor's, and she did not seem to be a passive patient based on her compliance with his recommended treatment of her medical concerns unrelated to the mammograms, as well as her response when she learned that she had breast cancer. The Hearing Examiner issued a proposed or-

der that Doctor be issued a reprimand, that he pay a civil penalty of $10,000, and that within one year from the date of the order, he complete eight hours of continuing medical education in medical ethics and record keeping. The Board then issued a Notice of Intent to Review the Hearing Examiner's decision.

Before the Board, Doctor argued that he repeatedly discussed the abnormal mammogram results with Patient and the need for a six-month follow-up. He contended that the Hearing Examiner erroneously concluded that Patient was compliant because she did not undergo her yearly mammogram in May 2001, and that the imposition of the fine and the continuing medical education courses in medical ethics was excessive because his conduct was neither unethical nor immoral.

Dismissing Doctor's arguments, the Board adopted the Hearing Examiner's findings holding that his failure to inform a patient constituted a deviation from accepted standards of care to warrant corrective measures. However, it did sustain his challenge to the Hearing Examiner's recommendation that he take a continuing medical education course in medical ethics because the Commonwealth did not charge him with an ethics violation.[3] This appeal by Doctor followed.[4]

Doctor contends that the Board's conclusion that his actions deviated from the generally accepted standards of care was not supported by substantial evidence because it improperly found Patient more credible than him regarding whether he

---

3. Instead of being required to attend eight hours of continuing medical education in courses involving medical ethics and record keeping, the Board modified this requirement so that Licensee had to complete eight hours of Category 1 continuing medical education courses in the areas of patient safety/communications and record keeping.

4. Our scope of review of a decision by the Board is limited to whether constitutional rights have been violated, the findings of fact are supported by substantial evidence, or errors of law have been committed. *Taterka v. Bureau of Professional and Occupational Affairs*, 882 A.2d 1040 (Pa.Cmwlth.2005).

had informed her of the results of the June 7, 2000 mammogram. He maintains that the Board improperly relied on factors such as Patient's compliance with treatment and his failure to document any discussion of the mammogram in her charts in making that determination.

Contrary to Doctor's argument, Patient's compliance and his failure to document his discussion with her was proper for the Board to use when making a determination as to who was more credible. As the Board noted, given her compliance with other treatments ordered, it was unlikely that Patient, faced with a potentially life-threatening illness, would not heed her physician's admonition for a follow-up study if communicated. As to Doctor's failure to document that he informed patient of the results of the mammogram, the Board properly took that into consideration because he failed to document in Patient's file that he had informed her of the results of the abnormal June 7 mammogram or her need to follow that up with another mammogram in six months. Moreover, the Board, in making its credibility determination, relied on the Hearing Examiner's observation that Patient's demeanor was more convincing.

What Doctor is actually arguing is that the Board should have found him more credible than Patient. Although he attempts to reargue the facts here to bolster his credibility, the Board was the ultimate fact-finder and decided to reject his testimony as to whether he had informed Patient of the results of the June 7, 2000 mammogram and the need for a follow-up within six months. *Gleeson v. State Board of Medicine,* 900 A.2d 430 (Pa.Cmwlth. 2006). Because we are bound by the Board's credibility determinations and may not reweigh the credibility of the witnesses on appeal, the order of the Board is af-

firmed. *Marrero v. Bureau of Professional and Occupational Affairs,* 892 A.2d 854 (Pa.Cmwlth.2005).

### ORDER

AND NOW, this *29th* day of *June,* 2007, the order of the State Board of Medicine, No. 0859–49–05, is affirmed.