# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Sheri Lynn Colston, LPC, : 
                     Petitioner : 
                                    : 
          v. :   No. 298 C.D. 2018
                                    :   Submitted: April 12, 2019
Bureau of Professional and : 
Occupational Affairs, State : 
Board of Social Workers, : 
Marriage and Family Therapists : 
and Professional Counselors, : 
                  Respondent : 

BEFORE:   HONORABLE ROBERT SIMPSON, Judge
              HONORABLE ANNE E. COVEY, Judge
              HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

**MEMORANDUM OPINION**
**BY JUDGE SIMPSON**            **FILED: July 17, 2019**

      Sheri Lynn Colston, LPC, (Licensee) petitions for review of a final order of the State Board of Social Workers, Marriage and Family Therapists and Professional Counselors (Board) that indefinitely suspended her professional counseling license and imposed investigation costs pursuant to the Social Workers, Marriage and Family Therapists and Professional Counselors Act (Act).[1] Licensee contends the Board abused its discretion in determining the doctrine of laches did not bar the disciplinary action. Further, Licensee argues that the Board's findings that she participated in a dual relationship with a client, J.F. (Client), are not supported by substantial evidence. She also asserts that the Board erred by failing to consider mitigating circumstances before suspending her professional counseling license. For the reasons that follow, we affirm.

---

[1] Act of July 9, 1987, P.L. 220, as amended, 63 P.S. §§1901–1922.

## I. Background

Licensee obtained her license to practice counseling in 2010, two years after starting her employment with Al-Assist Behavioral Health Center, an outpatient behavioral health center owned by the Greater Philadelphia Health Action, Inc. (Employer). Employer used an electronic recording system called "Celerity." Licensee, who saw approximately 100 clients a week, did not maintain prompt recordkeeping of her sessions in Celerity.

In April 2010, Licensee began treating Client on a weekly basis. Around January 2011, Licensee became aware that Client had developed a romantic attachment to her, otherwise known as "transference." Bd. Op., 2/20/18, at 19 n.1; Reproduced Record (R.R.) at 976a. At the time, Licensee did not document Client's transference in Celerity. In April 2011, Client informed Licensee of his mother's passing. Licensee attended Client's mother's funeral without obtaining prior supervisor approval or support from a colleague either before or after attending the funeral. Licensee did not document her attendance at Client's mother's funeral in Celerity.

After the funeral, Licensee increased Client's counseling sessions from once a week to three times a week without providing a clinical explanation for doing so in Celerity. While Licensee was still treating Client, she corresponded with Client by text message on two occasions concerning: (1) Licensee's safety in a storm near her area; and (2) Client's mother's passing. Licensee did not document either text exchange in Celerity.

2

During a July 2011 therapy session, Client sat next to Licensee and attempted to kiss her after suggesting they place a bag over the window. Thereafter, Licensee transferred Client's therapy to her colleague, Joanna Smutzler (Colleague). Licensee told Colleague that the reason for this transfer was that her therapy with Client stagnated. Notably, she did not mention Client's attempt to kiss her or his transference issues to Colleague or anyone else. Licensee also did not document Client's attempt to kiss her in Celerity.

In their third counseling session, in August 2011, Client informed Colleague that his therapeutic relationship with Licensee became a friendship with romantic overtones. He showed Colleague two photographs of Licensee on his cell phone that Licensee allegedly sent him, one depicting Licensee wearing a brassiere and pants and another in which Licensee wore only undergarments.

Colleague notified Employer's Chief Behavioral Healthcare Officer, Maggie Lyons (Director), and its Quality Assurance Coordinator, Christine Wright-Christian (QA Coordinator), of Client's allegations against Licensee. During this meeting, Colleague's superiors asked her to compare a photograph on Licensee's Facebook page to the photographs she saw on Client's phone. Colleague verified that the photographs did not appear to be the same as those on the Facebook page.

On August 15, 2011, after meeting with Licensee, Employer temporarily suspended her from seeing patients pending an investigation into the alleged conduct. Employer also instructed Licensee to report to a different Employer location for the next three business days to complete all of her documentation.

3

Instead, the next day, Licensee returned to her original office and spent two to three hours modifying her Celerity records of her sessions with Client. Notably, she amended the entries for at least five sessions in January and February 2011 by adding notes of when she first became aware of Client's transference and her instruction to Client about the importance of maintaining a professional relationship given her role as his therapist. Employer issued Licensee a written warning for insubordination and later terminated her employment on August 17, 2011.

An investigator at the Department of State, Bureau of Enforcement and Investigation (BEI), Michael Gregori (Investigator), commenced an investigation into Licensee's alleged misconduct in November 2011. However, BEI closed the investigation in January 2012 because Client did not authorize the release of his therapeutic records. BEI reopened the investigation in December 2013 after Client authorized the release of his therapeutic records. BEI completed the investigation in March 2014. In August 2016, the Bureau of Professional and Occupational Affairs (Bureau) filed an eight-count order to show cause (OSC) in relation to her interactions with Client. The charges included violations of the Act,[2] the Board's Code of Ethical Practice and Standards of Professional Conduct, 49 Pa. Code §§47.71-47.80 (Regulations), and the American Counseling Association Ethics Code (ACA Ethics Code) that the Regulations adopted. See ACA Ethics Code §§A.1.a, A.1.b, A.5.a, A.5.c (2005).

---

[2] Section 11(a)(2) of the Act authorizes the Board to refuse, suspend, revoke, limit or restrict a license if a licensee is found guilty of immoral or unprofessional conduct, which includes "any departure from or failure to conform to the standards of acceptable and prevailing practice." 63 P.S. §1911(a)(2). The Board may also suspend, refuse, revoke or limit a license for violating "standards of professional practice or conduct adopted by the [B]oard," Section 11(a)(3) of the Act, 63 P.S. §1911(a)(3), or "a regulation promulgated by the [B]oard," Section 11(a)(7) of the Act, 63 P.S. §1911(a)(7).

4

In Count One, the Bureau alleged that Licensee engaged in a dual or multiple relationship with a client in violation of Section 11(a)(7) of the Act, 63 P.S. §1911(a)(7), and Section 49.73(b) of the Board Regulations. In Count Four, the Bureau alleged Licensee breached the boundaries of a counselor and client in violation of Section 11(a)(3) of the Social Workers Act, 63 P.S. §1911(a)(3), and Section A.1.a of the ACA Ethics Code. In Count Seven, the Bureau alleged that Licensee engaged in nonprofessional interactions with Client by communicating via text message, sending pictures to him of herself wearing lingerie, and attending Client's mother's funeral in violation of Section 11(a)(3) of the Act, 63 P.S. §1911(a)(3), and Section A.5.c of the ACA Ethics Code. In Count Eight, the Bureau also alleged that Licensee violated Section 11(a)(2) of the Act, 63 P.S. §1911(a)(2), by engaging in unprofessional or immoral conduct.[3]

During the two-day hearing in March 2017, the Bureau presented testimony of Licensee's former coworkers (Colleague, Director and QA Coordinator) and of Investigator. Colleague testified about the nature of the photographs of Licensee on Client's cell phone. Director and QA Coordinator testified generally about recordkeeping in Celerity and the allegations of misconduct against Licensee. Investigator stated that during his interview, Licensee first denied sending photographs to Client, but later admitted to sending him professional photographs of herself wearing lingerie. He further testified Licensee said she was not sure why she sent the photographs to Client, but she did not believe they were inappropriate.

---

[3] In the remaining counts, the Bureau alleged that Licensee engaged in sexual intimacies with Client and did not maintain accurate records of the professional counseling services she provided to Client or his client progress. See Section 11(a)(3), (a)(7) of the Act, 63 P.S. §1911(a)(3), (a)(7); 49 Pa. Code §§49.21, 49.78; Sections A.1.b and A.5.a of the ACA Ethics Code.

Investigator also recalled that Licensee told him her body was covered in the pictures and that she was wearing something she might wear to the beach.

The Bureau's expert, Dr. Raymond W. Christner (Expert), licensed as both a counselor and a psychologist, testified that texting a client is an inappropriate form of communication and increases the risk of breaching confidentiality or creating misinterpretation. Expert opined that Licensee's attendance at Client's mother's funeral was inappropriate without first informing a supervisor or colleague.

In response, Licensee testified on her own behalf. She testified that she and Client communicated by text message on only two occasions, both of which he initiated. She felt obligated to respond out of civility. Licensee also denied admitting to Investigator that she sent photographs of herself to Client. Rather, Licensee testified Client accessed the photographs on her Facebook page without her knowledge.

Thereafter, a hearing examiner issued a proposed adjudication and order to indefinitely suspend Licensee's professional counseling license. The hearing examiner found sufficient evidence supported the following findings: Licensee attended Client's mother's funeral; Client expressed feelings for Licensee over the course of several sessions from January to July 2011; and Licensee and Client exchanged text messages. However, the hearing examiner did not find that sufficient evidence existed to establish that Licensee sent photographs of herself to Client or that Client kissed Licensee.

The Board provided notice of its intent to review the adjudication pursuant to 1 Pa. Code §35.226(a)(2). Licensee filed a brief on exceptions to the proposed adjudication.

The Board issued its own findings of fact and adjudication, sustaining Counts One, Four, Seven, and Eight of the OSC. Bd. Op., 2/20/18. It found that Licensee attended Client's mother's funeral without first obtaining approval from her supervisor or support from her clinical team, texted with Client, and sent Client inappropriate photographs of herself wearing lingerie. The Board also found that Licensee did not document the transference, including Client's attempt to kiss her, until after the allegations of impropriety were made against her. Bd. Op., Finding of Fact No. 20. Based on the findings, the Board concluded Licensee engaged in a dual relationship, violated counselor-client boundaries, engaged in nonprofessional interactions with Client, and committed unprofessional or immoral conduct. Conclusions of Law Nos. 5, 8, 11 and 12. However, the Board did not find that Licensee kissed Client and thus could not conclude that she engaged in sexual intimacies with him. Further, despite its dissatisfaction with Licensee's organization of her handwritten notes, the Board did not find that Licensee violated recordkeeping requirements. Thus, the Board dismissed the remaining counts.

Ultimately, the Board indefinitely suspended Licensee's counseling license under Section 11(a) of the Act after finding Licensee established a dual relationship with a client, violated counselor and client boundaries, and acted in an unprofessional or immoral way. The Board also imposed investigation costs on Licensee in the amount of $7,409.37. Licensee petitions for review from the Board's final order.

7

## II. Discussion

### A. Laches

On appeal,[4] Licensee contends the doctrine of laches precludes the Board from suspending her professional license. In Licensee's view, because of the Bureau's almost five-year delay in issuing an OSC, she could not access her handwritten session notes. She asserts these notes contained therapeutic justification for her efforts to monitor Client's transference, avoid the implication of a dual relationship, and use her professional judgment to determine how best to treat Client. Licensee insists that without access to her handwritten notes, she cannot adequately defend herself in this matter.

Laches requires an unjustified delay and a showing that an opposing party's position or rights were prejudiced as a result of the delay. In re Estate of Trowbridge, 920 A.2d 901 (Pa. Cmwlth. 2007). Application of the doctrine of laches depends not on whether a definitive time has elapsed since the cause of action accrued, but rather, whether "the complaining party is guilty of want of due diligence in failing to institute his action to another's prejudice." Weinberg v. State Bd. of Exam'rs of Pub. Accountants, 501 A.2d 239, 242 (Pa. 1985) (citation omitted). Records lost or destroyed may constitute prejudice. Id.

Regarding want of due diligence, Licensee fails to recognize that this proceeding was delayed nearly two years because Client did not authorize the release of his therapeutic records. After BEI obtained Client's records in February 2014,

---

[4] Our review of a licensing board decision is limited to determining whether the findings of fact were supported by substantial evidence and whether the board committed errors of law or constitutional violations. Kirkpatrick v. Bureau of Prof'l & Occupational Affairs, State Bd. of Barber Exam'rs, 117 A.3d 1286 (Pa. Cmwlth. 2015).

they were referred to the Bureau's Expert. Expert wrote his report in May 2016. Approximately three months later, the Bureau filed the OSC. Delay, without more, is insufficient to prove a lack of due diligence. State Bd. of Med. Educ. & Licensure v. Schireson, 61 A.2d 343 (Pa. 1948). We agree with the Board that, given all these factors, Licensee failed to carry her burden to prove a lack of due diligence.

Regardless, as to prejudice, the Board did not find Licensee in violation of recordkeeping provisions. Moreover, Licensee had the opportunity to defend her actions and present testimony about her professional judgment.

Licensee argues that evidence contained in her missing notes "explained the therapeutic justification behind [Licensee's] conduct and the efforts made by [Licensee] to monitor [Client's] transference and avoid any implication of a dual relationship." Pet'r's Br. at 15. However, Licensee offers no concrete explanation as to how her testimony would have differed if her notes were available. Indeed, it is hard to imagine any material difference in Licensee's testimony – regarding her admitted attendance at the funeral, admitted return of text messages and contested sharing of photographs in lingerie – even with the missing notes. Under these circumstances, we discern no reversible error on this issue.

## B. Substantial Evidence[5]

Next, Licensee argues the Board's findings are not supported by substantial evidence. Specifically, she challenges the Board's findings that she

---

[5] Substantial evidence is defined as such relevant evidence which a reasonable mind might accept as adequate to support a conclusion. Morris v. State Bd. of Psychology, 697 A.2d 1034 (Pa. Cmwlth. 1997).

engaged in a dual relationship with Client, violated counselor-client boundaries, and acted in an unprofessional or immoral manner.[6] Licensee also contends she attended Client's mother's funeral to support Client and enhance their therapeutic relationship. She insists that it was Employer's standard practice to allow counselors to use their professional judgment in making decisions for the benefit of their clients without constantly needing supervisory approval. Licensee also claims Client accessed the photographs of her from her social media page, which she only discovered after she transferred Client to another counselor.

Like other licensing boards, the Board is the ultimate finder of fact. Bentley v. Bureau of Prof'l & Occupational Affairs, State Bd. of Cosmetology, 179 A.3d 1196 (Pa. Cmwlth. 2018). "[E]ffect must be given to the expertise of an administrative agency, which may draw on this expertise and experience in factual inquiries." Shrader v. Bureau of Prof'l & Occupational Affairs, State Bd. of Veterinary Medicine, 673 A.2d 1, 2 (Pa. Cmwlth. 1995). On appeal, we are bound by the Board's credibility determinations and may not reweigh the credibility of the witnesses on appeal. Koscielniak v. Bureau of Prof'l & Occupational Affairs, State Bd. of Medicine, 928 A.2d 402 (Pa. Cmwlth. 2007).

---

[6] As support, Licensee again maintains therapeutic justification for her actions is documented in her missing handwritten notes. However, the Board found that "regardless of her explanations, Licensee's course of conduct poses a substantial risk of harm to patients in this Commonwealth." Bd. Op., 2/20/18, at 35; Reproduced Record at 992a. Thus, access to Licensee's handwritten notes would not advance her argument. Additionally, Licensee maintains Client accessed the photographs on her social media page and that she did not become aware of this until after she transferred Client to another counselor. Therefore, as the Board correctly notes, Licensee would not have any handwritten notes pertaining to the photographs.

10

Under Section 49.73(a) of the Board Regulations, "[d]ual or multiple relationships occur when the licensee engages in multiple or ongoing interactions with clients/patients . . . in more than one context, whether professional, social or business." 49. Pa. Code. §49.73(a). Section 49.73(b) of the Board's Regulations in relevant part states:

> (b) *Dual or multiple relationships prohibited.*
>
> (1) A licensee shall <u>avoid</u> dual or multiple relationships and conflicts of interest with any client/patient which could impair the licensee's professional judgment or increases the risk of client/patient exploitation.
>
> (2) A licensee may not undertake or continue a professional relationship with a client/patient, supervisee or student when the objectivity or competency of the licensee is, or could reasonably be expected to be, impaired or when the relationship with the client/patient, supervisee or student is exploitative.

49 Pa. Code §49.73(b)(1)-(2) (emphasis added).

The record reveals undisputed testimony that Licensee went to Client's mother's funeral. The Board relied on Expert's testimony that a professional counselor who is asked by a client to attend a funeral should seek approval, or at minimum, provide notice, before or after attendance. The Board similarly found Investigator more credible than Licensee and concluded that Licensee sent two photographs of herself wearing lingerie to Client. The Board also credited Expert's testimony that regardless of how Client accessed Licensee's cell phone number, text messages are an inappropriate form of communication between counselor and client.

11

Further, Board Regulations require licensees to take precautions if a dual or multiple relationship cannot be avoided:

> (5) When a dual or multiple relationship cannot be avoided, a licensee shall take reasonable professional precautions, such as informed consent, consultation, supervision and documentation, to ensure that judgment is not impaired and that no exploitation occurs.
>
> (6) If a licensee finds that, due to unforeseen factors, a potentially harmful dual or multiple relationship has arisen with a client/patient, the licensee shall attempt to resolve it with due regard for the best interests of the client/patient and maximum compliance with the [A]ct and this chapter.

49 Pa. Code §49.73(b)(5)-(6) (emphasis added).

As the Board noted, after learning of Client's feelings for her, Licensee, by her own admission, "work[ed] with the transference." Bd. Op. at 34; R.R. at 991a. See also Notes of Testimony (N.T.), 3/9/17, at 464; R.R. at 553a. Licensee maintains she acted appropriately by transferring Client to another counselor as soon as she felt she could no longer treat him in light of his transference. However, after learning of the transference, Licensee had a duty to implement "professional precautions … to ensure that judgment is not impaired …." 49 Pa. Code §49.73(b)(5). Licensee did not testify that she obtained "informed consent, consultation, supervision and documentation to ensure that judgment is not impaired and that no exploitation occurs." Id.

12

Rather, the Board found that Licensee not only continued working with Client in the months after learning of his transference, but that she also engaged in the following unprofessional conduct: going to his mother's funeral; sending photographs of herself in lingerie; and responding to his text messages. Further, the Board found that Licensee did not tell Colleague that Client attempted to kiss her or that he developed a transference. Licensee instead advised that Client required a transfer to another counselor because of stagnation in his therapy.

Accordingly, we conclude substantial evidence supports the Board's findings that Licensee engaged in nonprofessional interactions with Client, established a multiple or dual relationship, and violated professional boundaries between a client and a counselor.

### C. Abuse of Discretion

Finally, Licensee maintains the Board abused its discretion by indefinitely suspending her professional license. Relying on Bentley, Licensee argues the Board erred by not significantly weighing the mitigating factors, including her professional judgment to make a determination to attend Client's mother's funeral.

As noted by our Supreme Court, "[i]n the absence of bad faith, fraud, capricious action or abuse of power, reviewing courts will not inquire into the wisdom of [an administrative] agency's action or into the details or manner of executing agency action." Slawek v. State Bd. of Med. Educ. & Licensure, 586 A.2d 362, 365 (Pa. 1991). Judicial discretion may not be substituted for administrative

discretion.  Blair v. Bureau of Prof'l & Occupational Affairs, State Bd. of Nursing, 72 A.3d 742 (Pa. Cmwlth. 2013).

> In its final adjudication and order, the Board stated, in relevant part:
>
> [T]he Board finds that [Licensee's] violations are very serious and represent a breach of trust and patient dignity. Moreover, it is an aggravating factor that [Licensee] recognized [Client's] development of emotional attachment to her and voluntarily elected to encounter the transference for a prolonged period of months despite [Client] showing potentially dangerous signs of being infatuated with [Licensee], such as tracking down her telephone number to send her text messages. [Licensee] knew that this was an issue but still developed a dual relationship with [Licensee] by attending his mother's funeral, sending him pictures of herself in lingerie and exchanging friendly text messages with [Client].
>
> ***
>
> In addition, the Board carefully considered the context of photographs that were sent to [Client]. The Board takes note of [Licensee's] explanation to [Investigator] that she didn't feel that the pictures contained anything inappropriate, that it was something she would wear to the beach. However, the Board points out that this was not a situation where [Client] saw [Licensee] at the beach in a bikini, but instead was a situation where [Licensee] had professional pictures taken of herself in lingerie that she explicitly gave to [Client] as well as allowing [sic] the pictures to be posted on publicly accessed websites. The Board finds this factor especially aggravating given [Licensee's] knowledge of [Client's] transference for her.
>
> While time has passed, Licensee continues to take zero responsibility for her actions and instead claims that everyone who testified concerning her conduct in 2011 is lying.

14

Bd. Op. at 34-35; R.R. at 991a-92a.

Further, the Board <u>did</u> consider mitigating evidence. For example, the Board noted that six years elapsed since Licensee's professional misconduct and that Licensee testified she since learned the importance of proper documentation. The Board also found that Licensee did not commit any other professional violations and that Licensee indicates she does not intend to practice in this Commonwealth in the future.

We conclude the Bureau satisfied its burden of proving Counts One, Four, Seven, and Eight of the OSC and was therefore authorized to impose discipline under Section 11(b) of the Act, 63 P.S. §1911(b). Because Section 11(a) of the Act permits the Board to suspend a license for violating the ACA Ethics Code, the Board's suspension of Licensee's counseling license was neither capricious nor a flagrant abuse of discretion, especially considering Licensee knew of Client's transference.

### III. Conclusion

Discerning no error or abuse of discretion in the Board's adjudication and order, we affirm.

_____
ROBERT SIMPSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Sheri Lynn Colston, LPC,   :
       Petitioner :
           :
    v.      : No. 298 C.D. 2018
           :
Bureau of Professional and  :
Occupational Affairs, State   :
Board of Social Workers,    :
Marriage and Family Therapists :
and Professional Counselors,  :
       Respondent :

## **O R D E R**

   **AND NOW**, this 17th day of July 2019, the order of the Bureau of Professional and Occupational Affairs, State Board of Social Workers, Marriage and Family Therapists and Professional Counselors is **AFFIRMED.**

             _____
             ROBERT SIMPSON, Judge