**Erik James BLAIR, R.N., Petitioner**

v.

**BUREAU OF PROFESSIONAL AND OCCUPATIONAL AFFAIRS, STATE BOARD OF NURSING, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs April 5, 2013.

Decided May 22, 2013.

Publication Ordered July 23, 2013.

job offer rather than through an earning power assessment, *Kachinski* is still in play.

Charles W. Jelley, Greensburg, for petitioner.

Beth S. Michlovitz, Assistant Counsel, Harrisburg, for respondent.

BEFORE: McGINLEY, Judge, and SIMPSON, Judge, and COLINS Senior Judge.

OPINION BY Judge SIMPSON.

Eric James Blair, R.N., (Licensee) petitions for review of a final order of the State Board of Nursing (Board) that stayed an indefinite suspension of his professional nursing license in favor of probation subject to 42 conditions, including

monitoring conditions that restrict Licensee from practicing in a homecare setting for a minimum of three years. Primarily, Licensee contends the Board erred in denying him, as an individual with a disability, a reasonable accommodation to practice in a homecare setting in violation of Title II of the Americans with Disabilities Act of 1990[1] (ADA) and Section 504 of the Rehabilitation Act of 1973[2] (Rehab Act). Licensee further asserts he is entitled to an award of attorney fees under those statutes. Upon review, we affirm.

## I. Background

### A. Generally

Licensee holds a professional nursing license in Pennsylvania, which the Board issued in 2004. In July 2006, the Board suspended Licensee's license for one year as a result of his conviction for a misdemeanor violation of the Controlled Substance Drug Device and Cosmetic Act (Drug Act).[3] Licensee pled *nolo contendere* to unlawful possession of Fentanyl, a Schedule II narcotic, and received probation.

Licensee also served 13 months in prison for two counts of felony theft for stripping copper from abandoned coal mines. In June 2007, while incarcerated, Licensee detoxed from heroin.

In September 2008, the Board reinstated Licensee's unrestricted license following his release from incarceration. In August and September 2008, Licensee submitted to drug screens conducted by Westmoreland County. Licensee's tests were negative.

However, in October 2008 the Board, pursuant to Section 14(a)(2) of the Profes-

1. 42 U.S.C. §§ 12131–12165.

2. 29 U.S.C. § 794.

3. Act of April 14, 1972, P.L. 233, *as amended*, 35 P.S. §§ 780–101–780–144.

sional Nursing Law (Nursing Law),[4] ordered Licensee to submit to a mental and physical examination by Robert M. Wettstein, M.D. (Board's Physician), a board certified psychiatrist. Section 14(a)(2) authorizes the Board to suspend or revoke a nursing license if

> [t]he licensee is unable to practice professional nursing with reasonable skill and safety to patients by reason of mental or physical illness or condition or physiological or psychological dependence upon alcohol, hallucinogenic, or narcotic drugs or other drugs which tend to impair judgment or coordination, so long as such dependence shall continue.

63 P.S. § 224(a)(2). "In enforcing this clause ... the Board shall, upon probable cause, have the authority to compel a licensee to submit to a mental or physical examination as designated by it." *Id.* Licensee submitted to the requested mental and physical examinations in December 2008.

### B. Return to Employment

Meanwhile, in November 2008, following a background check and a pre-employment drug screen, an in-home nursing care provider (Current Employer), hired Licensee to provide homecare nursing to a ventilator-dependent quadriplegic patient (Patient), who's breathing is electronically regulated by a diaphragmatic pacing system (DPS). Patient requires 24-hour nursing care, which is provided by five nurses. Patient's ultimate goal is to learn to breathe without a ventilator.

In November 2008, Licensee became Patient's primary care nurse. Working the day shift, Licensee became actively involved in implementing Patient's DPS. Licensee keeps detailed notes on Patient's

progress, which are evaluated by Patient's pulmonologists in Pittsburgh and Atlanta, Georgia. Patient is not prescribed any opiate medications.

Patient's Fiancée oversees Patient's care by Licensee and other health care professionals. She is aware of Licensee's substance abuse history and criminal background. However, Patient's Fiancée saw no indications that Licensee was impaired while working in her home.

### C. PNAP

In November 2009, Licensee, on his own, contacted the Pennsylvania Nurse Peer Assistance Program (PNAP). PNAP arranged for Licensee to submit to a chemical dependency evaluation at Gateway Rehabilitation Center (Gateway) in Greensburg, Pennsylvania. In a December 2009 evaluation, Gateway assigned Licensee "an Axis I diagnosis of 'Opiod Dependence, Sustained Full Remission.'" Proposed Adjudication and Order (PAO),[5] 10/28/10, Finding of Fact (F.F.) No. 30; Reproduced Record (R.R.) at 31a. Gateway recommended Licensee attend 90 group meetings in 90 days with its nurses' 12–step program. *Id.* Gateway also recommended that Licensee submit to random urine screens. *Id.*

Licensee complied with Gateway's recommendations. Since beginning in December 2009, Licensee consistently tested negative for controlled substances. F.F. No. 31; R.R. at 32a. Also, Licensee's December 2009 hair follicle test was negative for psychoactive substances. F.F. No. 32; R.R. at 32a.

Nevertheless, PNAP's standard treatment contract, which is modeled after the Bureau of Professional and Occupational

---

4. Act of May 22, 1951, P.L. 317, *as amended,* 63 P.S. § 224(a).

5. *See* Certified Record (C.R.), Item # 18.

Affairs' (Bureau) Professional Health Monitoring Program (PHMP), prohibits participating nurses from practicing either in a homecare setting or without direct supervision in the workplace. As part of its agreement with PHMP, PNAP cannot modify the contract provisions prohibiting practice in an in-home setting. Therefore, Licensee declined to sign a treatment contract. Despite his unwillingness to agree to the prohibition against practicing in a homecare setting, Licensee fully participated in Gateway's drug screening program and group support treatment.

### D. Board Proceeding

Following his examination of Licensee, Board's Physician submitted a March 2009 report to the Bureau's prosecuting attorney setting forth Licensee's medical and substance abuse history.[6] Thereafter, the Bureau filed a formal disciplinary action against Licensee alleging he could not practice nursing with reasonable skill and safety to patients in a homecare setting due to his heroin dependence.

In January 2010, the Board held a hearing at which both parties presented evidence. Board's Physician testified regarding his examinations of Licensee. He assigned Licensee "an Axis I diagnosis of 'Heroin dependence disorder in reported remission.'" F.F. No. 13; R.R. at 29a. He opined Licensee "is safe to practice professional nursing *only* if he participates in a structured monitoring and treatment program for three to five years for his opiate dependence disorder." *Id.* (emphasis added).

Licensee testified on his own behalf. He provided a candid personal history regarding his medical conditions, substance abuse, marriage, family, and employment.

Dr. Alexandre Y. Dombrovski (Licensee's Physician), a psychiatrist who evaluated Licensee in December 2009, also testified. He assigned Licensee "an Axis I diagnosis of 'Opiod dependence in full sustained remission.'" F.F. No. 37; R.R. at 33a. He opined Licensee "is safe to practice professional nursing is [sic] he participates in random drug testing." *Id.* To that end, Licensee's Physician agreed with Gateway's treatment recommendations and indicated "he did 'not see need for direct supervision.'" F.F. No. 38; R.R. at 33a.

Patient and Patient's Fiancée also testified regarding the high quality of Licensee's nursing care, including his skill and dedication. They both testified that Patient's care would be jeopardized if the Board precluded Licensee from continuing to work as a home health care nurse. Current Employer's Director of Adult Services similarly testified as to the high quality, skill and dedication of Licensee's nursing care.

Licensee also presented testimony from PNAP's Executive Director of Operations. She testified regarding the extent of Licensee's participation in the PNAP/PHMP treatment program.

### E. Proposed Adjudication and Order (PAO)

In October 2010, a Department of State hearing examiner (Hearing Examiner) is-

---

**6.** Licensee suffered from migraine headaches since age 14, which were characterized by nausea, vomiting and light sensitivity. From 2003 to 2005, Licensee's primary care physician prescribed Vicodin for his headaches. Licensee later received Demerol and Dilaudid injections on an emergency basis for pain relief. By early 2005, Licensee began using intravenous heroin, purchased on the black market, for headache relief. He used heroin daily, including while working as a registered nurse. Licensee ultimately detoxed from heroin in June 2007 while incarcerated.

sued a PAO. Hearing Examiner accepted Board's Physician's diagnosis of heroin dependence disorder and his opinion that Licensee is safe to practice professional nursing only in a structured monitoring and treatment program for three to five years. PAO at 12, R.R. at 36a. Ultimately, Hearing Examiner reasoned:

> In 1985, the General Assembly amended the [Nursing Law] and other health care licensing statutes to provide for an impaired professional program through which chemically dependent practitioners can remain in practice while pursuing a program of recovery. For more than 20 years the Board has relied on the PHMP and [sic] to administer the statutorily mandated program to both benefit recovering professionals while protecting the public health. *Among the monitoring provisions developed over more than two decades is the prohibition against participants working in a home setting without regular daily supervision and oversight. The undersigned hearing examiner is not persuaded that the Board shall alter that standard provision in the instant case.*

PAO at 14; R.R. at 38a.

Accordingly, the proposed order indefinitely suspended Licensee's nursing license, but stayed the suspension in favor of probation for a period of no less than three years, subject to 42 conditions, including the following monitoring conditions:

> 23. *When permitted to return to practice, [Licensee] shall not do any of the following unless [Licensee] first obtains written approval from the PHMP case manager:*
>
> a. Practice in any capacity that involves the administration of controlled substances;
>
> b. Function as a supervisor;

> c. *Practice in a private practice setting or without direct supervision;*
>
> d. Work in an emergency room, operating room, intensive care unit, cardiac catheterization laboratory, or coronary care unit; or
>
> e. *Practice as an agency nurse.*
>
> 24. *[Licensee] may not work in any practice setting,* including attendance at any educational program/course that includes a clinical practice component with patients [and] requires a current professional/practical nursing license, *without direct supervision.*
>
> 25. *Direct supervision is the physical presence of the supervisor on the premises so that the supervisor is immediately available to the licensee being supervised when needed.*

Proposed Order, 10/28/10, at ¶¶ 23–25; R.R. at 44a–45a (emphasis added).

### F. Notice of Intent to Review; Exceptions

Upon reception of the PAO, the Board filed a notice of intent to review the record. Thereafter, Licensee filed timely exceptions to the PAO. Licensee asserted Hearing Examiner: (1) erred in failing to award any credit for a three-year period of sobriety; (2) erred in determining the Bureau met its burden of proof; (3) erred in failing to find Licensee is a person with a disability requiring a reasonable accommodation to the standard PNAP treatment contract; (4) erred in failing to grant Licensee a reasonable accommodation of practicing in a homecare setting with supervision from Employer and Patient and his family, and while in PNAP treatment; (5) erred in finding that Licensee needs to participate in another three years of PNAP treatment; and, (6) erred in failing to find the Board punished Licensee twice for the same conduct in violation of the prohibition against cruel and unusual pun-

ishment in Article I, Section 13 of the Pennsylvania Constitution, as applied in civil manners.

## G. Final Adjudication and Order

In May 2012, the Board entered a Final Adjudication and Order (FAO)[7] adopting Hearing Examiner's findings of fact, conclusions of law and discussion. The Board also addressed Licensee's exceptions.

First, the Board noted recovering heroin addicts are presumptively qualified individuals with a disability under the ADA. As such, Licensee must be provided a reasonable accommodation to practice nursing. *Johnson v. Dep't of Transp.*, 805 A.2d 644 (Pa.Cmwlth.2002). However, it is within the province of the Board to determine what is a reasonable accommodation for purposes of the ADA, and whether it includes permitting Licensee to work in a homecare setting.

Here, the Board determined, permitting Licensee to practice nursing in the PHMP's Disciplinary Monitoring Unit (DMU) is a reasonable accommodation which would allow Licensee to practice nursing with reasonable skill and safety. Conversely, there are serious risks to permitting Licensee to practice in a homecare setting without adequate monitoring or supervision. A homecare patient may be exposed to certain risks if Licensee should relapse. In addition, noting Licensee's theft convictions, the Board reasoned a homecare patient may be exposed to an additional risk of theft.

Citing Board's Physician's testimony and opinions, the Board also rejected Licensee's contention that the Commonwealth failed to meet its burden of proving that Licensee is incapable of practicing nursing with reasonable skill and safety to patients. It found it unreasonable to interpret Section 14(a)(2) of the Nursing Law so narrowly as to preclude the monitoring of any addicted nurse who stopped using drugs or alcohol without regard for the length of abstinence or quality of recovery.

Further, the Board rejected Licensee's contention that the doctrine of laches barred the Board's disciplinary action. It observed that Licensee failed to establish any prejudice due to the Board's delay in prosecuting this case. Specifically, Licensee failed to show the delay resulted in loss of memory, witness unavailability, lost or destroyed evidence or changes in Licensee's position in reliance upon the Board's inaction. *See Weinberg v. State Bd. of Exam'rs of Pub. Accountants,* 509 Pa. 143, 501 A.2d 239 (1985) (defense of laches requires not only unjustified delay, but prejudice to opposing party as a result of that delay). In short, Licensee's ability to mount a defense was not compromised by the delay.

In addition, the Board rejected Licensee's claims of double jeopardy and cruel and unusual punishment. In 2006, the Board automatically suspended Licensee's nursing license under the Drug Act as a result of his conviction for unlawful possession of Fentanyl, a Schedule II narcotic. See Section 123(c) of the Drug Act, 35 P.S. § 780–123(c) (appropriate licensing boards shall automatically suspend, for up to a year, the license of any practitioner upon conviction of a misdemeanor under the Drug Act).

In a separate proceeding, the Board instituted the present disciplinary action under Section 14(a)(2) of the Nursing Law based on Licensee's inability to practice nursing with reasonable skill and safety to patients due to his heroin addiction. Disciplinary action taken to protect

7. *See* C.R., Item # 32.

the public serves a deterrent rather than a punitive purpose and thus does not violate the constitutional prohibition against double jeopardy. *Sweeny v. State Bd. of Funeral Dirs.*, 666 A.2d 1137 (Pa.Cmwlth. 1995).

Summarizing, the Board noted it is charged with the responsibility to regulate the nursing profession to protect the public health and safety. *Barran v. State Bd. of Medicine*, 670 A.2d 765 (Pa.Cmwlth. 1996). With this in mind, the Board reasoned:

> The Board has considered [Licensee's] brief, but *gives significant weight to the evaluation performed by [Board's Physician] and his recommendation that [Licensee] is not safe to practice nursing without proper monitoring at this time due to his past substance abuse.* The Board does not feel that [Licensee] should be denied the ability to practice, but rather be permitted to practice under certain restrictions and guidelines of the DMU. Because [Licensee] has struggled with addiction in his past, and has relapsed on two occasions, *the Board feels that it is important to ensure that he be properly supervised in order to ensure that he does not relapse again and put patients at risk.* As such, in order to protect the citizens of the Commonwealth, the Board feels that the standard provisions of the DMU agreement remain in place and that [Licensee] be allowed to practice only under direct supervision, as outlined in the proposed adjudication and order.

FAO, 5/1/12, at 9; R.R. at 10a. Licensee petitions for review.

### H. Partial Stay of Final Order

Following his appeal, the Board granted Licensee a partial stay of the monitored practice and direct supervision provisions in Paragraph's 23(c), 23(e), 24 and 25 of the probationary conditions in the FAO "pending appellate review." *See* Certified Record (C.R.), Item # 34 (Order Granting Partial Stay, 6/6/12). The Board further ordered that all other provisions of the Final Order remain in effect.

### II. Standard of Appellate Review

■ Our standard of review of a Department of State licensing board decision is limited to determining whether the findings of fact are supported by substantial evidence and whether the board committed errors of law or constitutional violations. *Bethea–Tumani v. Bureau of Prof'l & Occupational Affairs*, 993 A.2d 921 (Pa. Cmwlth.2010); *Barran.* As the ultimate fact-finder, a licensing board may accept or reject the testimony of any witness, either in whole or in part. *Id.* When reviewing a board decision, this Court may not reweigh the evidence or second guess the board's credibility determinations. *Id.*

■ Further, unless the licensing board is accused of bad faith or fraud, appellate review of a board's disciplinary sanction is limited to determining whether the board flagrantly abused its discretion or executed its duties or functions in a purely arbitrary and capricious manner. *Bethea–Tumani* (citing *Slawek v. State Bd. of Med. Educ. & Licensure*, 526 Pa. 316, 586 A.2d 362 (1991); *Goldberger v. State Bd. of Accountancy*, 833 A.2d 815 (Pa.Cmwlth. 2003)).

### III. Issues

Licensee states three primary issues for our review. He contends the Board erred in denying him a reasonable accommodation to practice nursing in a homecare setting, in violation of the ADA and the Rehab Act. Licensee also contends the Board erred in determining he is incapable of safely practicing nursing with a reasonable accommodation. Licensee there-

fore claims he is entitled to an award of attorney fees under those statutes. Additionally, Licensee argues, given his treatment and sustained recovery, the Board's disciplinary action requiring three more years of monitored practice and direct supervision amounts to a flagrant abuse of discretion, double jeopardy, and cruel and unusual punishment. Licensee further argues the Board's action is precluded by the doctrines of laches, *res judicata* and collateral estoppel.

## IV. Discussion

### A. Monitored Practice Requirements

■ We first address Licensee's contention that the Board erred or abused its discretion in determining he is incapable of safely practicing nursing with a reasonable accommodation. In short, Licensee asserts the Board erred in denying him an exemption for the standard requirements that impaired professionals recovering from a chemical addiction initially return to a monitored practice for a minimum three-year probationary period. *See* PAO at 13; R.R. at 37a. During the probationary period, the licensee is subject to direct workplace supervision, which is defined in the PHMP conditions (with emphasis added) as *"the physical presence of the supervisor on the premises* so that the supervi-

sor is immediately available to the licensee being supervised when needed." FAO, Final Order, 5/1/12, at ¶ 25; R.R. at 17a.

To that end, Paragraphs 23c and 24 of the Board's Final Order prohibit Licensee, without written permission from a PHMP case manager, from practicing in a private practice setting or any setting without direct supervision. R.R. at 16a. Further, Paragraph 23e prohibits Licensee from practicing as an agency nurse during the probationary period. *Id.*

Here, both Hearing Examiner and the Board accepted as credible Board's Physician's diagnosis of heroin dependence disorder in reported remission and his opinion that Licensee can safely practice professional nursing *only* if he is participating in a structured monitoring and treatment program.[8] *See* PAO, F.F. No. 13; FAO at 6. It is within the province of the Board to accept Board's Physician's medical opinion as more credible and persuasive than Licensee's Physician's opinion that Licensee is in full sustained remission and thus did not need direct supervision. *Bethea–Tumani; Barran.* Consequently, the Board determined that Board's Physician's recommendation that Licensee practice only under direct supervision for a minimum

8. Board's Physician provided 10 reasons for his opinion that Licensee needs to participate in a structured monitoring and treatment program for a period of three to five years. *See* Notes of Testimony (N.T.), 1/11/10, at 51–56 (R.R. at 129a–130a). First, heroin addiction is a chronic relapsing disorder, not a short term condition easily cured. N.T. at 51. Second, Licensee has two previous treatment failures. *Id.* at 52. Third, Licensee only returned to treatment in preparation for the hearing, not because he believed he needed treatment. *Id.* Fourth, Licensee has some credibility problems regarding the accuracy of his self-report. Id at 52–54. He failed to tell Board's Physician that his wife used heroin or that he diverted Fentanyl while work-

ing for his past employer, UPMC Presbyterian University Hospital. *Id.* Fifth, Licensee has two criminal convictions, which indicates his inability to follow society's rules. *Id.* at 54–55. Sixth, Licensee still has persistent headaches, which caused him to use heroin the first place. *Id.* at 55. Seventh, because Licensee's wife used heroin in the past, she is also at risk of relapse. *Id.* Eighth, Licensee's father is an alcoholic. *Id.* Family history of substance abuse is a risk factor for future substance abuse for a healthcare professional. *Id.* at 55–56. Ninth, unsupervised homecare nurses may have access to medications that no one is told about. *Id.* at 56. Tenth, healthcare professionals do better when they are in a monitored program. *Id.*

period of three years is consistent with its overriding responsibility to protect the public health and safety. *See* FAO at 6–7, 9; R.R. at 7a–8a, 10a.

Nonetheless, Licensee argues, the facts of record support a contrary finding that he can safely practice nursing in the present homecare setting without direct supervision. To that end, Licensee cites numerous mitigating circumstances, including his skilled and dedicated service for Current Employer and Patient, and his voluntarily compliance with the drug screening and treatment provisions of the PHMP contract.

Although we sympathize with Licensee, and we view his recovery efforts as outstanding, we reiterate that it is within the province of the Board to make credibility determinations, weigh the evidence and resolve any conflicts in the evidence. *Bethea–Tumani; Barran.* In reviewing a licensing board's disciplinary sanctions, we will uphold the board's action absent bad faith, fraud, capricious action or abuse of power. *Slawek.* In other words, judicial discretion may not be substituted for administrative discretion. *Id.* Thus, the fact that a reviewing court may have a different opinion is insufficient to interfere with the agency's action. *See D.Z. v. Bethlehem Area Sch. Dist.,* 2 A.3d 712 (Pa. Cmwlth.2010).

■ Therefore, viewing the evidence, especially the expert medical evidence, in a light most favorable to the prevailing party in the administrative proceeding, we discern no error or abuse of discretion in the Board's order requiring Licensee's compliance with the monitored practice provi-

sions of the PHMP contract for a period of no less than three years. *See Herzog v. Dep't of Envtl. Res.,* 166 Pa.Cmwlth. 114, 645 A.2d 1381 (1994) (in a review of an administrative order, the prevailing party is entitled to the benefit of every inference that can logically be drawn for the evidence when viewed in a light most favorable to that party).

## B. Reasonable Accommodation

■ We next address Licensee's assertion that the Board erred in denying him, an otherwise qualified individual with a disability under the ADA and Section 504 of the Rehab Act,[9] a reasonable accommodation to practice as a registered nurse. The ADA prohibits discrimination against individuals based on their status as past drug abusers or addicts. *Firman v. Dep't of State, State Bd. of Med.,* 697 A.2d 291 (Pa.Cmwlth.1997). Here, Licensee is seeking an exemption from the PHMP requirements that he be restricted to a monitored practice, under direct supervision, for a minimum three-year period.

In opposition, the Board contends, allowing Licensee to practice nursing so long as he is in a PHMP monitoring program is a reasonable accommodation that would allow him to practice nursing with reasonable skill and safety to his patients. As support, the Board again relies on Board's Physician's testimony.

We agree with the Board. In *Firman,* we recognized that impaired medical practitioners, given their access to medications, present a clear and obvious danger to the public. Therefore, a licensing board has an important interest in preventing poten-

---

9. The law developed under Section 504 of the Rehab Act is applicable to Title II of the ADA. *See Helen L. v. DiDario,* 46 F.3d 325 (3d Cir.1995). Moreover, the language and implementing regulations of the ADA and Rehab Act are virtually the same. *Frederick L. v.*

*Dep't of Pub. Welfare, Cmwlth., of Pa.,* 364 F.3d 487 (3d Cir.2004). As such, the same judicial analysis applies under either statute. *New Directions Treatment Servs. v. City of Reading,* 490 F.3d 293 (3d Cir.2007).

tial harm caused by impaired medical practitioners. Thus, we reasoned in *Firman* that enrollment in PHMP treatment program is a reasonable accommodation under the ADA. "Under these programs, licensees addicted to drugs or alcohol will avoid disciplinary action, based solely on their addiction, *as long as they enroll in and progress satisfactorily in approved treatment programs* and do not constitute a threat to public safety." *Id.* at 297 (emphasis added).

Although *Firman* cites Section 4 of the Medical Practice Act[10] (relating to impaired professionals), the Nursing Law contains a similar provision. Section 14.1(c) of the Nursing Law[11] provides (with emphasis added):

> (c) *An impaired professional who enrolls in an approved treatment program shall enter into an agreement with the Board* under which the professional's license shall be suspended or revoked but enforcement of that suspension or revocation may be stayed for the length of time the professional remains in the program and makes satisfactory progress, complies with the terms of the agreement, *and adheres to any limitations on his practice imposed by the Board to protect the public. Failure to enter into such an agreement shall disqualify the professional from the impaired professional program and shall activate an immediate investigation and disciplinary proceeding by the Board.*

63 P.S. § 224.1.

In the present case, Hearing Examiner noted that in 1985, the General Assembly amended the Nursing Law to provide for an impaired professionals program. PAO at 14; R.R. at 38a. For 20 years, the Board has relied on the PHMP as a means through which chemically dependent professionals may remain in practice while protecting the public health. *Id.*

In light of Licensee's substance abuse history, which includes a misdemeanor conviction under the Drug Act for unlawful possession of Fentanyl, admitted use of heroin while on-duty as a nurse, and two theft convictions, we hold that allowing Licensee to practice under direct supervision subject to the monitored practice provisions of the PHMP agreement satisfies the reasonable accommodation requirements of the ADA and Rehab Act.[12] *Firman.*

### C. Remaining Arguments

We briefly address Licensee's remaining arguments that the Board flagrantly abused its discretion by requiring him to "re-enroll" in a second three-year term in the PHMP program and that a second three-year licensing restriction constitutes cruel and unusual punishment under Article I, Section 13 of the Pennsylvania Constitution, as applied in civil manners. License also contends the doctrines of laches, *res judicata* and collateral estoppel preclude the Board from imposing multiple penalties for the same conduct in multiple litigations between the parties.

■ First, as discussed above, Licensee never formally enrolled in the PHMP program. Rather, he contacted the PNAP in December 2009 after the Board began to investigate him. Although he agreed to comply with most of the terms, Licensee

---

**10.** Act of December 20, 1985, P.L. 457, 63 P.S. § 422.4.

**11.** Added by the Act of December 20, 1985, P.L. 409, *as amended.*

**12.** Having determined that Licensee is not entitled under the ADA or Rehab Act to the requested accommodation, we dismiss his claim for costs and attorney fees under those statutes.

declined to sign the treatment contract because it would prohibit him from practicing in a homecare setting. At the very minimum, Licensee failed to abide by the condition in Section 14.1(c) of the Nursing Law that he adhere to any limitations in a treatment plan imposed to protect the public. 63 P.S. § 224.1. *"Failure to enter into such an agreement shall disqualify the professional from the impaired professional program* and shall activate an immediate investigation and disciplinary proceeding by the Board." *Id.* (emphasis added). Consequently, the Board did not err or abuse its discretion in requiring Licensee to submit to a three-year period of monitored practice, including for the first time direct supervision.

■ For the same reasons, the Board's order does not violate the prohibition against cruel and unusual punishment in Article I, Section 13 of the Pennsylvania Constitution. Although Licensee, on his own volition, contacted the PNAP and voluntarily complied with most of the conditions of the standard PHMP treatment contract, he did not sign a treatment agreement, and he refused to submit to the monitored practice provisions designed to protect the public. In fact, Licensee practiced nursing for Current Employer without direct supervision during this entire period. As such, the Board's 2012 disciplinary sanction requiring that Licensee comply with all terms of PHMP does not constitute a second punishment. *See Conlon v. State Bd. of Nurse Exam'rs,* 68 Pa.Cmwlth. 349, 449 A.2d 108 (1982) (licensing suspension did not amount to double punishment where licensee's right to practice remained in place prior to the board's disciplinary sanction).

■ In addition, we note that disciplinary action taken to protect the public serves a deterrent rather than a punitive purpose and thus does not violate the dou-ble jeopardy provisions in Article I, Section 10 of the Pennsylvania Constitution and the Fifth Amendment to the United States Constitution. *Sweeny.*

■ Further, we agree with the Board that the doctrine of laches is to no avail here. Licensee failed to show the two-year delay between his initial 2006 suspension under the Drug Act and the 2008 commencement of the Board's investigation under Section 14(2) of the Nursing Law resulted in loss of memory, witness unavailability, lost or destroyed evidence or changes in Licensee's position in reliance upon the Board's inaction. To the contrary, Licensee testified on his behalf in great detail and presented expert medical evidence supporting his position. Further, Licensee did not claim any problem with witness availability. As such, Licensee's laches defense fails. *Weinberg.*

■ Lastly, we reject Licensee's contentions, assuming they were sufficiently raised below, that the Board is precluded under the doctrines of *res judicata* and collateral estoppel from imposing multiple penalties for the same conduct in multiple litigations between the same parties. As discussed above, the Board automatically suspended Licensee in 2006 under Section 123(c) of the Drug Act (licensing boards shall automatically suspend licensees for a period up to one year for a misdemeanor violation of the Drug Act) for unlawful possession of Fentanyl.

In 2008, after Licensee's license was reinstated, the Board commenced an investigation under Section 14(2) of the Nursing Law into Licensee's ability to practice nursing with reasonable skill and safety to patients in light of his heroin dependence disorder.

■ However, in order for either collateral estoppel or *res judicata* to apply,

the issue of law or fact decided in the prior action must be identical to the one presented in the later action.[13] *J.S. v. Bethlehem Area Sch. Dist.*, 794 A.2d 936 (Pa. Cmwlth.2002). Here, the Drug Act mandated that the Board automatically suspend Licensee for his misdemeanor conviction for unlawful possession of Fentanyl, a Schedule II narcotic. Licensee's suspension for possession of Fentanyl, however, is unrelated to the issue of whether he should be restricted under Section 14(2) of the Nursing Law for inability to safely practice nursing due to his heroin addiction. Consequently, neither *res judicata* not collateral estoppel apply here. *J.S.*

## V. Conclusion

For the above reasons, we discern no error or abuse of discretion in the Board's FAO requiring Licensee to comply with the PHMP standard requirements that impaired professionals recovering from a drug or alcohol addiction initially return to a monitored practice with direct workplace supervision for a minimum three-year probationary period. Accordingly, we affirm.

### ORDER

**AND NOW,** this 22nd day of May, 2013, the order of the Department of State, State Board of Nursing is **AFFIRMED.**

13. "Res judicata encompasses two related yet distinct principles: technical res judicata and collateral estoppel. Technical res judicata provides that where a final judgment on the merits exists, a future lawsuit on the same cause of action is precluded. Collateral estoppel acts to foreclose litigation in a subsequent action where issues of law or fact were actually litigated and necessary to a previous final judgment." *J.S. v. Bethlehem Area Sch. Dist.*, 794 A.2d 936, 939 (Pa.Cmwlth.2002) (citations omitted).